RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0299P (6th Cir.)
File Name: 00a0299p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

No. 97-3340

ALGIMANTAS DAILIDE,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 94-02499—Paul R. Matia, Chief District Judge.

Argued: July 29, 1998

Decided and Filed: September 5, 2000

Before: NELSON, BOGGS, and CLAY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Joseph T. McGinness, Cleveland, Ohio, for
Appellant. Jeffrey L. Menkin, UNITED STATES
DEPARTMENT OF JUSTICE, OFFICE OF SPECIAL
INVESTIGATIONS, Washington, D.C., for Appellee.
**ON BRIEF:** Joseph T. McGinness, Cleveland, Ohio, for
Appellant. Jeffrey L. Menkin, Susan Masling, William Henry
Kenety V, UNITED STATES DEPARTMENT OF JUSTICE,
OFFICE OF SPECIAL INVESTIGATIONS, Washington,

1

D.C., Michael Anne Johnson, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

CLAY, J., delivered the opinion of the court. NELSON, J. (p. 26), delivered a separate opinion concurring in part. BOGGS, J. (pp. 27-55), delivered a separate dissenting opinion.

––––––––––––––

## OPINION

––––––––––––––

CLAY, Circuit Judge.    Defendant Algimantas Dailide appeals from the district court's order granting partial summary judgment to the United States, on Counts I and IV of the government's six-count complaint brought pursuant to § 340(a) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1451, seeking to revoke Dailide's citizenship and cancel the Certificate of Naturalization issued to him, while dismissing the remaining counts without prejudice. In Count I of the complaint, the government alleged that Dailide was guilty of the persecution of civilians in violation of § 2(b) of the Displaced Persons Act of 1948 ("DPA"); and, in Count IV of the complaint, the government alleged that Dailide made material misrepresentations during the immigration process which rendered him ineligible for admission to the United States under § 10 of the DPA. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

### I.

Dailide was born on March 12, 1921, in Kaunas, Lithuania. On June 22, 1941, Nazi Germany invaded Lithuania, along with its capital, Vilnius, and reestablished a police force known as the *Saugumas* that had existed under the Soviet occupation of Lithuania but had disbanded prior to the German invasion. Dailide voluntarily joined the *Saugumas* in 1941, and served until 1944, when the *Saugumas* dissolved along with the Nazi regime. According to Dailide, he was first hired as a *Saugumas* clerk in late June of 1941, and about

I would therefore reverse the district court as to the misrepresentation count, as well.

### V

It should be unnecessary to add that this opinion does not represent the views of an "apologist[]" for Dailide"; "a travesty"; "no greater insult to the spirit and purpose" of America; or any of the other phrases flung about in the court's opinion. The issue is not whether Dailide is a nice man, or whether Nazis are evil. The sole issue before us now is whether a trial is necessary.

I emphasize that my opinion would only reverse the grant of summary judgment. Denaturalization proceedings could continue, and a full trial could produce the same result. However, in stripping an American citizen of that citizenship, the law is unmistakable that the government must turn square corners and prove its case by "clear, unequivocal, and convincing" evidence. Particularly in this case, where the degree of connection to persecution and the exact nature and timing of misrepresentations are crucial, disputed issues of fact should be resolved at trial, not by assumptions based on guilt by association, however well founded. I therefore respectfully **DISSENT**.

application, we cannot attribute a damning motive to his earlier actions.

Finally, the government notes that the DPC interviewed few applicants directly, which it suggests should lead us to place more weight on the DPC's adoption of the CIC report. The "adoption" theory did not, after all, explicitly apply to cases such as this one where there was no contemporaneous recantation. However, the DPC's reliance on the CIC, as well as its practice of not interviewing many applicants directly, was specifically noted by McGrath, and did not sway his conclusion. Furthermore, the cases that the government cites in support of its "adoption" theory are distinguishable. In two cases, the DPC relied not just on CIC materials but on a fraudulent DPC *Fragebogen* (questionnaire) filled out by the applicant as well, so that there was a misrepresentation made directly to the DPC. *See United States v. Kowalchuk*, 773 F.2d 488, 492 (3d Cir. 1985); *Leprich*, 666 F. Supp. at 971. In two other cases, the government was held to have provided adequate proof of reaffirmation before the Vice Consul (an official who is "charged with enforcement of the act"). *See Hajda*, 963 F. Supp. at 1467; *Palciauskas*, 559 F. Supp. at 1298–99. This leaves only one case cited by the government that parallels this one. *See United States v. Osidach*, 513 F. Supp. 51, 101–02 (E.D. Pa. 1981) (DPC relied on IRO document, which the district court held to suffice). However, *Osidach* did not discuss the issues raised by the BIA cases and the McGrath letter. More importantly, in *Osidach* the government's summary judgment motion was denied, and a full trial was held. 513 F. Supp. at 58, 107 n.34. The district court made a specific finding of fact that Osidach *knew* that his false IRO form would be submitted to the DPC and relied on, and *thus* there was a "misrepresentation of a material fact before the DPC . . . ." *Id*. at 102. That factual finding is exactly what we cannot supply on summary judgment by an inferential leap. Taking the evidence in the light most favorable to Dailide, he made a misrepresentation to an agency *not* "charged with enforcement or administration" of the DPA. Osidach had a trial to find that the facts were otherwise. Dailide has not.

six months later was then made a *Saugumas* police candidate. During this time, the infamous Aleksandras Lileikis became Chief of the Vilnius *Saugumas*.[1] Also during this period, Dailide claims that he worked in the Communist Section[2] of the *Saugumas* for approximately two weeks, and then was transferred to the Information Section of the *Saugumas*, where he gathered background information on prospective employees, including their nationality and citizenship. Thereafter, around the end of 1942 or early 1943, Dailide contends that he was given a field assignment, at which time he was issued a firearm which he claims he carried but never used.

The record details the role the *Saugumas* played during the Nazi occupation of Lithuania as follows:

> During the first days, apart from the formation of the partisan auxiliary squad, a Lithuanian Security Police and Criminal Police force was created. . . . The Lithuanian Security and Criminal Police operates according to the orders and guidelines provided to them by *Einsatzkommando 3* and its activities are under constant surveillance [*kontrolliert*] and, as much as possible, they are used for security police work which cannot be performed by the SD's own personnel, particularly searches, arrests, and investigations. . . .

---

[1] *See United States v. Lileikis*, 929 F. Supp. 31 (D. Mass. 1996) (granting the government's motion for summary judgment which claimed Lileikis' actions during German Nazi occupation of Lithuania as Chief of the Vilnius *Saugumas* required revocation of his citizenship).

[2] According to Dailide, the purpose of the Communist Section was to gather information on persons thought to be Communist and who would likely overthrow the government. The government contends, however, that this section is properly referred to as the Communist-Jew Section. The government asserts that this section was responsible for, among other things, apprehending and interrogating Jews and those who assisted them. For the purposes of this appeal, the name of this section is immaterial.

(J.A. at 501-02.) The *Einsatzkommando 3* was a subunit of four mobile killing units responsible for the destruction of Jews in the Nazi-occupied areas of the Soviet Union. The *Einsatzkommando 3,* commanded by SS Colonel Jaeger, was specifically responsible for the execution of all Jews in the Vilnius region. The killing of the Vilnius Jews was conducted in three stages: 1) the Jews were arrested and transferred to Vilnius' Lukiskes Hard Labor Prison where they were kept in open cells; 2) the Jews were marched or driven from Lukiskes Prison to Paneriai, a wooded site about six miles outside Vilnius; and 3) the Jews were shot and killed in groups. The record indicates that SS Colonel Jaeger reported to SS General Stahlecker that the *Einsatzkommando 3* accomplished its goal of eliminating Jews from Lithuania:

> Today I can ascertain that the goal of solving the Jewish problem for Lithuania has been attained by *Einsatzkommando 3*. There are no Jews in Lithuania anymore, apart from work Jews, including their families. . . . I wanted to finish off these work Jews and their families as well but that brought me a sharp challenge from the Civilian Administration (the Reich Commissar) and the Wehrmacht [Armed Forces] and brought about this prohibition: These Jews and their families may not be shot!

(J.A. at 485.)

Dailide denies knowing that a relationship existed between the *Saugumas* and the German Police or military authorities. He also denies having any personal knowledge that Jews were shot at Paneriai, although he admits to having heard such a "rumor." However, according to the Government's expert historian, Dr. Yitzhak Arad, who has testified in similar denaturalization proceedings, by the end of 1941, approximately 30,000 Vilnius Jewish civilians had been killed by the *Saugumas*. Dr. Arad, who relied on records from the Lithuanian Central State Archives in Vilnius, on records from his own files, and on records held by the United States National Archives, stated in his affidavit that Vilnius killings

no evidence to the contrary. *Cf. United States v. Hajda*, 963 F. Supp. 1452, 1467 (N.D. Ill. 1997) (not reaching the merits, and noting that Vice Consuls would typically ask applicants "about their wartime activities and whether they worked with or for the Germans during the war"); *United States v. Palciauskas*, 559 F. Supp. 1294, 1298–99 (M.D. Fla. 1983) (alien affirmed false statements in interview with Vice Consul). Therefore, the government has certainly not proven as an undisputed fact that Dailide reaffirmed his misrepresentation.

There is another flaw in the government's case, one that underscores the reasons for rejecting the government's "adoption" theory. It is that the only evidence in the record regarding Dailide's motivation for lying on the CIC form suggests that his reason for misrepresenting his *Saugumas* service was to avoid being sent to his death in the Soviet Union, and was not specifically "for the purpose of gaining admission into the United States," as required by Section 10. *See generally* JULIUS EPSTEIN, OPERATION KEELHAUL (1973) (detailing forced repatriation to Soviet Union, and subsequent murder of, large numbers of prisoners and refugees). Although a statement by Dailide later in the visa application process (*i.e.*, to the DPC or the Vice Consul) would be more easily characterized as fulfilling this requirement, his early statement to the CIC is less easily categorized as such. In particular, the court overstates, *supra* at 20, by saying that the CIC form was completed "[w]hen applying for his DPA visa." The CIC form is dated December 13, 1949. The DPA visa application is dated January 23, 1950 (tab 117, Exh. 5, 7). It *may* be true that Dailide knew and intended that the CIC answers would go to the DPC and help him gain admission to America. But that has not been shown as an undisputed fact. *Federenko*, properly relied on by the court, *supra* at 21, involved a person who was found, after trial, to have lied on the DPA application itself. *See Federenko*, 449 U.S. at 498, 507 n.26. If that were the case here, motivation and knowledge would not be issues that are relevant, if at all, after findings at trial. But since Dailide did not lie on the DPA

persisted in the false statement before the [DPC], the consuls or the [INS]." The answer is an unequivocal "No."

Attorney General McGrath did not concur in all of the language in the BIA's position. He noted that he might have arrived at a different conclusion in the *Seuss* and *Altman* cases, though he did not indicate what that different conclusion would have been. However, he went on to state, quite specifically, that:

> Such misrepresentation [a material one as to residence] to the Counter Intelligence Corps of the United States Army . . . is not a misrepresentation within the contemplation of Section 10, since the Counter Intelligence Corps is not an agency charged with the enforcement or administration of the Displaced Persons Act.

This ruling of law could hardly be clearer that the bare fact of a false statement to the CIC does not violate Section 10.

Alternatively, did Dailide "reassert" or "persist in" his statement? The government offers only sparse evidence for such a conclusion. First, a DPC report repeats the false chronology from the CIC report. But this internal report does not contain any attestation or reaffirmation by Dailide, or even any indication that Dailide knew of the report. Next, the government states that "Dailide swore to the truth of the information on his visa application and was interviewed by a State Department Vice Consul. Once again, Dailide did not reveal his service in the *Saugumas*." (Appellee's Brief at 12). A review of the visa application plainly shows that it contains no questions or information relating to police service. There is no place on the application where Dailide's earlier efforts to conceal his police service could be renounced. Nor do the documents incorporated by reference into the application have anything to do with police service. A review of the part of the district-court record cited by the government regarding the Vice Consul interview reveals only Dailide's testimony that the matter of his police service never arose in the interview, and not that he actively concealed it. The government offers

were conducted in the three-step process described above, and, although the Jews arrested by the *Saugumas* were nearly always shot and killed, those Jews who were not initially killed were confined to one of two ghettos. According to Dr. Arad, ghetto conditions were wretched, in that the overcrowded conditions led to lice, filth, and disease; food and firewood were scarce; electrical appliances were banned; the exits of the ghettos were sealed by barbed-wire obstructions, and the doors and windows that faced the streets were barricaded; telephone and postal communications were forbidden; and Jews attempting to smuggle food into the ghetto were shot. The ghettos were liquidated in 1941 and in 1943, respectively, with a total of approximately 55,000 Vilnius Jewish civilians killed.

Dailide left Lithuania in 1944, and fled to Germany as a refugee. Dailide remained in Germany until 1949, and eventually entered the United States in 1950 as a non-quota immigrant under a DPA visa. In order to ultimately obtain his DPA visa, Dailide had to undergo a three-step process. First, he had to qualify as a refugee within "the concern" of the International Refugee Organization ("IRO"); second, he had to receive a determination of displaced-person status by the Displaced Persons Commission ("DPC"); and third, Dailide had to qualify for and receive a visa from the United States Department of State.

After apparently qualifying as a refugee under the IRO, Dailide completed a personal history form prepared by the United States Army's Counter Intelligence Corps. ("CIC"), an organization which conducted investigations and interviews of applicants on behalf of the DPC. The personal history form asked Dailide for the "[e]xact description" of his activities during the war. Dailide stated that during 1942-44 he was employed as a "practitioner forester" in Vilnius, Lithuania. Moreover, the form asked whether the applicant had been involved in any police service membership, to which Dailide responded, "No." Dailide claims to have concealed his membership in the *Saugumas* for fear of repatriation to the Soviet Union. Dailide eventually received displaced-person

status, was granted a DPA visa, and entered the United States on February 19, 1950. Dailide then applied for naturalization on February 3, 1955, which was granted by order of the United States District Court for the Northern District of Ohio on September 6, 1955.    Dailide currently resides in Brecksville, Ohio.

In July of 1993, after *Saugumas* records became available to outside investigators, Immigration and Naturalization Service ("INS") agents and the Office of Special Investigations ("OSI") personnel interrogated Dailide at his office in Cleveland regarding his role in the *Saugumas*. Thereafter, on December 7, 1994, the Government filed a six-count complaint seeking to revoke Dailide's citizenship and cancel his certificate of naturalization pursuant to § 340(a) of the Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. § 1451(a).    The government sought summary judgment on Count I, which alleged that Dailide was guilty of assisting the enemy in persecuting civil populations in violation of § 2(b) of the DPA, and on Count IV, which contended that Dailide made material misrepresentations during the critical stage of the immigration process in violation of § 10 of the DPA.  The district court granted the government's motion for summary judgment on these two counts on January 29, 1997, and on February 28, 1997, the district court entered an amended order granting the government's motion, and dismissing the remaining counts without prejudice. *See United States v. Dailide,* 953 F. Supp. 192 (N.D. Ohio 1997).  Dailide then filed a timely notice of appeal.

## II.

### Standard of Review -- Summary Judgment & Denaturalization Proceedings

This Court reviews a district court's order granting summary judgment *de novo. Equitable Life Assur. Soc'y v. Poe,* 143 F.3d 1013, 1015 (6th Cir. 1998).  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together

An alien made a false statement or presented a false document to the CIC, but never directly to the Commission, Consul, or the [INS]. This false statement reached the Commission, Consul or the [INS] through its incorporation in the file which moves intact from agency to agency.  The Commission rejected the case solely on the basis of the file, without having interviewed the applicant, and without any direct reaffirmation of the false statement by the alien to the Commission.  This case has not been reactivated and the applicant has made full disclosure of the truth.  Does the original rejection by the Commission, under Section 10, on the basis of the file alone, bar the applicant who has now made full disclosure?

BIA Memo at 4.  The BIA's suggested answer is no.  This was because "for a false statement to be a wilful [sic] misrepresentation under Section 10, it must have been made *directly* to the [DPC], the Consuls, or the [INS]." (Memo at 6, question 2, emphasis in original.)  What matters for Section 10 purposes, then, is not the fact of the recantation, but rather the fact that the misrepresentation was made only to the CIC. This is so even when the DPC relies on the CIC document.

The BIA makes this point even more clearly when it states that a false statement to the CIC does not become a "misrepresentation . . . by adoption" to the DPC merely because the statement is present in the DPC's file, "where the alien has never persisted in the false statement before the [DPC]." Putting it another way, there is no misrepresentation for Section 10 purposes "unless [the alien] adopts or ratifies the false statement or false document by *reasseverating* the misrepresentation before the administrative or enforcement agency." (emphasis added).  BIA memo, at 4.

Finally, at page 6 of the memo, the BIA answers the exact question at issue here, in answer to question 3 posed to it by the DPC. "Do[es] . . . a false statement to the [CIC], which becomes part of the [DPC] file . . . become a misrepresentation to the [DPC] . . . where the alien has never

is no basis in the law to allow such a distinction to make a difference — either a misrepresentation is material or it is not, and all of these misrepresentations (Dailide's and the ones in the BIA cases) were material.

The government argues next that it would be absurd to hold that Dailide did not make a misrepresentation to the DPC merely because the DPC did not interview Dailide personally, and despite the fact that the DPC relied upon the CIC's information (as it generally did). The government thus offers another basis to distinguish the BIA cases — that since all of the defendants either recanted or were found not to have misrepresented anything, neither *Suess* nor *Altman* involved a misrepresentation that was relied upon by the DPC. By contrast, Dailide did not recant, and his lies were relied upon by the DPC.

This distinction does not distinguish, for reasons made clear in the McGrath letter. In the letter to the BIA, dated December 5, 1951, two months after Attorney General McGrath approved the results in *Suess* and *Altman*, McGrath discusses the *Suess* and *Altman* cases, noting that they are binding precedent,[5] and saying that they should be limited to the following propositions: (1) misrepresentations about residence are material; and (2) such misrepresentations are not disqualifying when made to the CIC, since it is not an agency charged with the enforcement of the Act.

The purpose of the letter, though, was not to determine which types of misrepresentations should result in denial of admission. Rather, the letter was concerned with the best way to categorize a hypothetical applicant, who lied to the CIC and whose application was then rejected by the DPC. McGrath considered the following hypothetical situation presented by a submission from the BIA:

---

[5] Although Dailide's actions preceded all of these cases, the government has given no basis to conclude that the new cases represented a shift in policy, or that Dailide's case would have been decided under different standards.

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476 (6th Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317; 106 S. Ct. 2548 (1986)). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Determination of whether a fact is "genuine" requires consideration of the applicable evidentiary standard. *Id.* A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Id.* Once the moving party satisfies its burden, "the burden shifts to the nonmoving party to set forth specific facts showing a triable issue." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574; 106 S. Ct. 1348 (1986).

In denaturalization proceedings the government carries a heavy burden of proof. *Fedorenko v. United States*, 449 U.S. 490, 505 (1981). The evidence justifying revocation of citizenship must be "clear, unequivocal, and convincing" and not leave the issue in doubt. *Id.* However, the defendant bears an equally heavy burden in establishing that he strictly complied with all the congressionally imposed prerequisites to the acquisition of citizenship, because his failure to comply with any of these conditions renders the certificate of citizenship "illegally procured," and naturalization that is unlawfully procured can be set aside. *Id.* at 506.

As noted by the district court, although the government bears a heavy burden in denaturalization proceedings, the facts of a case may be such that revocation of citizenship at the summary judgment stage may be appropriate. *See, e.g., United States v. Koreh,* 59 F.3d 431 (3rd Cir. 1995); *United States v. Lileikis*, 929 F. Supp. 31 (D. Mass. 1996); *United States v. Leprich,* 666 F. Supp. 967 (E.D. Mich. 1987). Those supportive of Dailide may attempt to distinguish these cases by arguing that the acts of the defendants therein were

somehow more egregious than those of Dailide. We are unpersuaded by such an argument where the *degree* of persecution is not at issue. Rather, the issue is whether Dailide engaged in such persecution and, specifically, at the summary judgment stage, whether a genuine issue of material fact remained for trial as to his participation in the persecution. Indeed, under the facts of this case, we find the evidence that Dailide assisted the enemy in persecuting civil populations and willfully misrepresented material facts for purposes of gaining admission to the United States to be so "clear, unequivocal, and convincing," that no stronger or more obvious a case exists for summary judgment.

Apologists for Dailide may also argue that summary judgment was not appropriate because it has been said that, "where the fate of a human being is at stake, we must not leave the presence of his evil purpose to conjecture." *Knauer v. United States,* 328 U.S. 654, 659 (1946). However, under the facts of this case, to find that the presence of Dailide's evil purpose was mere conjecture would be a travesty of justice and make a mockery of the process by which traditional denaturalization proceedings should occur. To deny the government's motion here would do nothing more than protect one who clearly, as a matter of law, failed to comply with all the congressionally imposed prerequisites to the acquisition of citizenship.[3]   *Fedorenko,* 449 U.S. at 505.

---

[3]We note at this juncture that we take issue with the dissent's claim that the government bears a "heavier" burden at the summary judgment stage of a denaturalization case. The government's burden of proof at a denaturalization proceeding does not change; it must show by "clear, unequivocal, and convincing" evidence that revocation of citizenship is justified. *Fedorenko v. United States*, 449 U.S. 490, 505 (1981). To succeed at the summary judgment stage, the government must simply show that it has met this burden as a matter of law.

given to the counter-intelligence corps, and that the CIC was not "charged with the enforcement or administration" of the Act.

In support of this proposition, Dailide cites roughly contemporaneous Bureau of Immigration Affairs (BIA) case law, and a 1951 letter from Attorney General McGrath to the Chairman of the BIA. Only two of the BIA cases are relevant. The first BIA case is *In re Suess et al.*, Nos. A-7927755–57 (Sept. 26, 1951)*, approved by Att'y Gen.* (Oct. 16, 1951). In that case, an applicant, Suess, gave the Army false information regarding her whereabouts at certain points in the past. When applying for a visa, however, Suess voluntarily admitted her misrepresentations in her sworn visa application. The BIA found that even though the CIC was charged with performing investigations in pursuance of the Displaced Persons Act, it was not charged with the *enforcement* of the Act. Therefore, even though Suess's misrepresentation was material, it did not violate Section 10, because it was made only to the CIC.

The other case, decided the same day, is *In re Altman et al.*, Nos. A-7991300–01 (Sept. 26, 1951)*, approved by Att'y Gen.* (Oct. 16, 1951). The Altmans gave false information to the CIC about when exactly they entered Germany. That information was passed along to the DPC, along with a CIC analysis of the inconsistencies. The Altmans came before the DPC and told the truth under oath. Had they persisted in lying when called before the committee, the BIA held, they would have been ineligible for admission into the United States. As it was, however, they did not so persist. Citing *Suess*, the BIA ruled the Altmans were eligible for admission.

The government first attempts to distinguish these BIA cases by saying that they involved the minor matter of residence, place and time, and not the more significant matter of police service. This distinction is not persuasive. The BIA held in the above cases that the misrepresentations were material. *Suess*, at 2; *Altman*, at 2. Dailide's misrepresentations were more weighty, to be sure, but there

Displaced Persons Commission. According to Ashe, based on the facts he had been told — that Dailide was an armed officer in the *Saugumas* from 1941 to 1944 and that the Police were under Nazi control; that the *Saugumas* participated in the arrest and incarceration of Vilnius Jews; and that Dailide himself participated in arresting Jews trying to escape from the ghetto, and in inventorying the possessions of an arrested Jew — if any one of these three things had been known and true, Dailide would not have been eligible for admission. Next, noting Dailide's misrepresentation, Ashe said that even if Dailide's service in the *Saugumas* would not have made him ineligible per se as a "member of a hostile movement" (another basis for refusing displaced-person status not relevant to this appeal), knowledge of that service would have led the DPC to investigate Dailide further. Ashe then noted a case in which a member of the Waffen SS was denied admission because, even though his unit was no longer considered a part of a hostile movement, he had misrepresented his service. Ashe's testimony establishes the materiality of Dailide's lie.

Dailide contests the district court's ruling with several alternative claims: that his misrepresentation was not made to a person charged with enforcement or administration of the Displaced Persons Act; that his misrepresentation was not willful; that his misrepresentation was not material; and that his misrepresentation was not made for the purpose of gaining admission into the United States. I would reverse as a matter of law on the first point, and thus need not address Dailide's other arguments in detail.

Dailide's argument that he did not misrepresent to anyone "charged with the enforcement or administration" of the Act rests on an implementing regulation of the Displaced Persons Act, 8 C.F.R. § 700.11 (1950), which says that a disqualifying misrepresentation must be to a "person while he is charged with the enforcement or administration of any part of the act, of any matter, material to an alien's eligibility for any of the benefits of this act." Dailide notes that the questionnaire on which we conclude that he wilfully attested to false facts was

### III.

**Congressional Prerequisites for Citizenship & Basis for Denaturalization**

Pursuant to § 1451(a), citizenship may be revoked and the certificate of naturalization may be canceled if both were "illegally procured or were procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a) (1994). One of the requirements to "legally" obtain a naturalization order and certificate is that the applicant was "lawfully admitted for permanent residence." 8 U.S.C. § 1427(a)(1) (1994). Lawful admission for permanent residence, in turn, requires that the applicant enter the United States pursuant to a valid immigrant visa. *Fedorenko*, 449 U.S. at 515.

Therefore, entry into the United States under an invalid visa is a failure to comply with congressionally imposed statutory prerequisites to citizenship which renders any certificate of citizenship revocable as illegally procured under § 1451(a). The government contends that Dailide unlawfully obtained admittance to the United States because he did not obtain a valid visa inasmuch as he (1) assisted the enemy in the persecution of civil populations, and (2) willfully misrepresented material facts for purposes of gaining admission to the country.

### IV.

**Whether Dailide Assisted the Enemy in the Persecution of Civil Populations**

As stated, Dailide entered this country in 1950 as a non-quota immigrant under a DPA visa. In order to have qualified as an eligible displaced person for purposes of emigration into the United States under the DPA, the applicant must have been a "displaced person" as defined in the DPA. Pursuant to § 2(b) of the DPA, "'Displaced Person' means any displaced person or refugee as defined in Annex I of the Constitution of the International Refugee Organization

[IRO] and who is the concern of the International Refugee Organization." In turn, the IRO sets forth a number of groups who are *not* "of concern" to the IRO, and include persons "who can be shown to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations." IRO Manual, Annex I, Part II, §16 (2)(a). Accordingly, if the government is able show that Dailide assisted in the persecution of civilians, it would succeed in its claim that Dailide was not eligible for a DPA visa at the time he entered this country.[4]

The *Fedorenko* Court emphasized that the proper focus in ascertaining whether one "assisted in persecution" should be on conduct of the individual, noting that mere membership in an enemy group was not sufficient to constitute assistance in persecution. 449 U.S. at 513-14 n.34. By way of example, the Court noted as follows:

> [A]n individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians.

*Id*. However one's conduct, even if involuntary, may rise to the level of assisting the enemy in persecution, *id*.; "[t]here

---

[4] Dailide argues that there is no evidence that the Lithuanian civilians allegedly persecuted by the Vilnius *Saugumas* were of "countries, Members of the United Nations." This argument was not addressed by the district court; however, the record indicates that the Soviets incorporated Lithuania into the U.S.S.R. in the summer of 1940. (J.A. at 662.) Therefore, it is clear that Lithuania was a member of the United Nations.

claim, dictates that "[a]ny person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States." 62 Stat. 1009, 1013 (1948). I have no doubt that Dailide made a misrepresentation, but the question is whether his misrepresentation was sufficient to violate Section 10.

The evidence supporting the government's case here is simple. First, there is the CIC questionnaire, signed by Dailide, that says he was a practitioner forester between 1942 and 1944, and that he was not a member of any organization, police force, or civil service. *See supra* at 5. The form was in German and English, and the form indicates that Dailide spoke German and "a little" English at the time. Then there is a Displaced Persons Commission internal report that repeats the "forester" line in the chronology. Next is the following exchange in Dailide's deposition:

> Q   Well, did you and any other Lithuanians [awaiting processing in Germany] discuss whether you should put down or not put down on the immigration forms that you had been a member of a police organization in Lithuania or a military organization?
> A   There were, I guess, discussions, because I know at the beginning, Americans turned over to Russian Communists some people, you know, like from Ukrainians and this; and some people even, I remember, commit suicide, because they no want to go back to Russia. And it wasn't fair. All people were afraid very much. And since the Lithuania — said this American government was in and maybe change this. If they get friendly with Russia they might turnover –
> Q   Uh-huh.
> A   So the advice by most, whatever, to say that you should not, I mean, tell those things, you know.

The final piece of evidence, tying all of this together, is an affidavit from Daniel Ashe. Ashe was a Case Analyst for the

146. Thus, the record does not establish for summary-judgment purposes that Dailide was armed when he performed the acts alleged by the government.

A court could conceivably conclude that Dailide's actions still constituted assistance in persecution even if he was not armed at the time. But the government's own affiant did not say this, however, apparently finding that armed status was important. And, as quoted by the court, *supra* at 14, the *Osidach* court found, after trial, that the defendant there was armed while undertaking his actions. There may be a difference between helping to round up escapees from the ghetto in a vague sense, and helping to round them up by pointing a gun at them. Perhaps the former could suffice for a finder of fact to rule against Dailide after a full trial, but I cannot conclude that it is sufficient at this stage in the proceedings. The government must present "clear, unequivocal, and convincing" evidence supporting denaturalization, and it must do so without any dispute as to material facts. It has not met that burden.

It should also be noted that most of the court's characterization, *supra* at 14-16, of Dailide's actions in the questioning of prisoners is far from undisputed. In particular, the key statement that "prisoners were put to death depending on how they answered the questions asked of them," *supra* at 15, is hotly disputed, as is the exact nature of Dailide's role in asking questions and recording information. It may be that the court's conclusion is exactly correct, but that can only be determined by a finder of fact. It should also be noted that Judge Nelson's concurrence does not express an opinion on this line of reasoning.

Therefore, I would hold that summary judgment was not appropriate on the "assisting in persecution" count, and would remand for trial.

## IV

I turn now to the misrepresentation count. Section 10 of the Displaced Persons Act, upon which the government bases this

need be no personal participation by the defendant in the commission of physical atrocities." *Koreh*, 59 F.3d at 442.

In short, the determination of whether a defendant's individual conduct could be considered as assisting the enemy in this regard must be determined on a case-by-case basis with reference to the relevant facts. *Fedorenko,* 449 U.S. at 513-14 n.34*; Koreh*, 59 F.3d at 439. Whether Dailide's individual conduct rose to the level of assisting the Nazi regime in persecuting Jews as a matter of law requires a two-step inquiry. First, we must determine whether a genuine issue of material fact remains for trial as to whether the *Saugumas* persecuted civil populations; and second, whether a genuine issue exists as to whether Dailide assisted the *Saugumas* in the persecution.

### 1.  Role of the *Saugumas*

The government presented documents that revealed the role the *Saugumas* played in assisting the Nazi regime in persecuting Jews. Specifically, the government produced the Stahlecker Report which detailed the role the Lithuanian Security Police and Criminal Police played during the Nazi occupation of Lithuania. *See supra* discussion Part I. The Stahlecker Report stated that the *Saugumas* were used to assist *Einsatzkommando 3*, particularly with searches, arrests, and investigations.[5] The *Saugumas* apparently carried out their operations satisfactorily, receiving praise from SS General Stahlecker. The General noted in his report that "[a]fter the removal of the accused and unfit personnel and under the constant surveillance [*kontrolliert*] of *Einsatzkommando 3*, the Lithuanian Security and Criminal Police produced entirely satisfactory work . . . ."

Dailide argues that the government's translation of the Stahlecker Report changes the German word *kontrolliert* to

---

[5] As stated previously, the *Einsatzkommando 3* was primarily concerned with the execution of all Jews in Lithuania. *See supra* discussion Part I.

"control" instead of Dailide's preferred translation "surveillance." However, viewing the translation as meaning "constant surveillance" as opposed to "constant control" the Stahlecker Report still shows that the Germans created, staffed, and directed the *Saugumas*.

Moreover, Dr. Arad stated in both his affidavit and deposition that Jews who were arrested by the *Saugumas* were almost always shot at Paneriai. Dr. Arad gave accounts of some of the atrocities committed by the *Saugumas*. For example, Dr. Arad stated that the *Saugumas* arrested two Jews, Saulius Varsaskis and Jenta Rachmaniene, for escaping from the ghetto, and ordered them transferred to the Chief of the German Security Police. Varsaskis' prison card states that he was treated "in accordance with orders" on December 22, 1941. According to Dr. Arad, the phrase "dealt with in accordance with orders" was a German euphemism meaning that the prisoner was killed.

Dr. Arad provided another example where two Jews, Gitta Kaplan and her six-year-old daughter Fruma, were arrested by the Vilnius *Saugumas* for escaping from the ghetto. Thereafter, the *Saugumas* ordered them transferred to the Chief of the German Security Police, and both were "dealt with in accordance with orders" on December 22, 1941. As to the arrests of Gitta and Fruma Kaplan, the *Lileikis* court noted as follows when it considered this same evidence:

> [T]he arrest of a woman solely because she was suspected of being a Jew, and the confinement of a six year old girl in a hard labor prison for "hiding" after being spirited from a ghetto by her mother, would satisfy even the most liberal construction of the term "persecution."

929 F.Supp at 39 n.14.

Dailide argues that Dr. Arad's opinion as an expert should be discounted because he had "no personal knowledge" of the *Saugumas* when he drafted his affidavit. He raised this same argument below in his motion to bar Dr. Arad as a witness.

money to be turned over to Nazi authorities."[3] (emphases added). All of these background assumptions have been established sufficiently for summary-judgment purposes, with the exception of one: whether or not Dailide was armed when he did these things.

The government claims that Dailide was armed throughout his service in the *Saugumas*, but the record[4] is not clear or consistent. In an interrogatory answer, he says he had a handgun, time unspecified, but never used it. *See* tab 125 to Motion for Summary Judgment, ¶6 (L). Dailide said in his 1994 deposition that he was issued a Walther (German-made) handgun, that he was not trained in its use, and that he never used it. Tab 117, pp. 17-18. His 1995 deposition can be read to say he wore a gun when questioning people, though the time is not specified. Tab 118, pp. 152-153. In his affidavit submitted in response to the summary-judgment motion, though, Dailide stated that he was not issued his gun until he was assigned to do field work in late 1942, long after the critical events detailed in the documents cited above. Finally, when asked if he "used the gun," at the time of the arrest of the Soaks, he did not admit having a gun then. Tab 118, p.

---

[3] The government offered no evidence as to whether Dailide would have been ruled a persecutor merely for being in the *Saugumas*, which leads to the irrelevance of the bulk of the much-disputed evidence regarding the *Saugumas*'s general role.

For instance, we would not grant judgment as a matter of law against the *Saugumas*'s barber or shoeshine boy. While Dailide was obviously much more than a shoeshine boy, the determination of whether Dailide was closely enough linked to the persecutory activities of the *Saugumas* must necessarily shift to an examination of what Dailide himself did, which is precisely the analysis in this section.

[4] The government cites several documents in its attempt to establish that Dailide was armed. While all of these documents are in the full district-court record, the government did not include most of them in the joint appendix it submitted to this court. Although we were able to obtain the documents from the district-court record, confidence that the government has the required "clear, unequivocal, and convincing" evidence to support its position is undermined when the government does not even bother to submit that evidence to us.

Dailide submits an affidavit by Jerome Brentar, an IRO screener. Brentar testified that persecution-assisters were, like war criminals, typically included on a list from the United Nations. If someone was not on the list, but there were accusers, countrymen of the applicant whose good faith the officer had no reason to doubt, the officer was to withhold a decision and contact the appropriate regional governmental authorities for more information. The Manual agrees with this account of the proper procedure.

Significantly, the decision by the screening officer was based in large part on the contents of a CM/1 Form. The CM/1 contained the applicant's answers to relevant questions. Unfortunately, Dailide's CM/1 is not in the record. Brentar says that without the form it is impossible to say whether Dailide would have passed eligibility. Brentar also notes that the *Saugumas* was not on a list of groups whose members were automatically disqualified.

Thomas says, however, that an ineligible person was an ineligible person, even if he was not denounced and was not on a list. The source of the damning information was irrelevant. On the other hand, Thomas continues, misrepresentation *per se* was not a disqualifier. In other words, an applicant's eligibility was based on what the truth was: if the truth was sufficient to warrant awarding refugee status, it did not matter that the applicant tried to conceal the truth; by contrast, if the truth was sufficient to warrant rejection, it did not matter how the IRO obtained that information.

What would have happened to Dailide had the truth been known? Crucially, Thomas said in his affidavit that if he had considered a case like Dailide's he would have excluded Dailide. But Thomas specifies that his conclusion assumes that Dailide "participated at any time as an *armed* police officer in the arrest of Jews attempting to escape the Vilnius Ghetto," or that he "participated as an *armed* police officer in the search of one or more Jews and/or confiscated their

The district court denied Dailide's motion and found that Dr. Arad was competent as an expert. In reviewing the record, we find no reason to doubt Dr. Arad's competence; his affidavit cites the facts and documents upon which his opinion is based, and his opinion is well-informed. More importantly, experts may base their testimony upon information not within their personal knowledge or observation. *See* FED. R. EVID. 702, 703. In addition, it should be noted that the *Lileikis* Court found that Dr. Arad's analysis of some of the same Lithuanian documents used in this case was credible when used in Lileikis' denaturalization proceeding. *See Lileikis*, 929 F. Supp. at 38; s*ee also Backes v. Valspar Corp.*, 783 F.2d 77, 79 (7th Cir. 1986) (finding that a witness' testimony in a closely related suit indicates competence).[6]

Based upon the Stahlecker Report and events documented in Dr. Arad's affidavit regarding the activities of the *Saugumas*, we hold that no genuine issue of material fact remains as to whether the *Saugumas* assisted the Nazi regime in persecuting the Jews in Lithuania, particularly during the

---

[6]Dailide also argues that Dr. Arad's affidavit was prepared jointly by Dr. Arad and Michael MacQueen, a historian and member of the government's litigation team; and thus, Dailide alleges the affidavit cannot be used because it was not totally based on Dr. Arad's personal knowledge. In his deposition, Dr. Arad stated that he prepared his entire affidavit, partly on his own and partly in consultation with MacQueen. Dr. Arad also stated that MacQueen assisted him in preparing his report. Dr. Arad's actions were proper under FED. R. CIV. P. 26(a)(2)(B) which provides that an expert is required to submit a written report prepared and signed by a witness, and that [t]he report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor . . . ." *Id.* As noted in the Advisory Committee Notes,

Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports . . . . Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness.

Here, both Dr. Arad's affidavit and report cites the bases for his opinions, and Dr. Arad signed the report and swore to the accuracy of its contents in compliance with the rule.

time when Dailide was a member of the *Saugumas* – that being the years 1941 through 1944. Accordingly, we must now examine Dailide's role as a member of the *Saugumas* to determine whether a genuine issue of material fact remains that Dailide assisted the *Saugumas* in this persecution.

## 2. Individual Conduct of Dailide

It is undisputed that Dailide was an active member of the *Saugumas.* He conceded to detaining and searching Jewish civilians escaping from the ghetto, to interviewing prisoners held at Lukiskes prison, and to carrying a police sidearm. This admission by Dailide in itself shows that no genuine issue of fact remains for trial as to whether Dailide assisted the *Saugumas* in persecuting Jewish civilians. In *United States v. Osidach,* 513 F. Supp. 51, 99 (E.D. Penn. 1981), the court found that the defendant's "role as an armed, uniformed interpreter for either the Ukrainian police's or the German gendarmes' interrogation of suspects could be classified as both physical and mental persecution." The court reasoned that:

> The mere presence of the watchful eye of the conqueror or his deputies, coupled with the often demonstrated presence of both the means and the inclination to persistently inflict various indignities, physical abuse, injuries or even death, without notice or reason, is the personification of mental persecution, to anyone, let alone innocent civilian men, women and children reduced to various degrees of substandard mental and physical well-being.

*Id.*

Similarly, as in *Osidach,* Dailide's act of interviewing prisoners held at Lukiskes Prison, which as stated previously was an intermediate stop to Paneriai, constituted mental persecution. Dailide admitted that, while at the prison, he would be escorted by a guard to a room, and the guard would then bring in the prisoner to be interviewed. Dailide would

participated in arresting and imprisoning people who *escaped* from the ghetto. There is no inconsistency.

## C

Though Dailide's attack on the facts thus fails, his attack on the law does not. That is, with all of the evidence that sticks to Dailide above, even using the summary-judgment standard, the government still needs to prove that these facts dictate that Dailide must, as a matter of law, lose his citizenship.

Judge Nelson's concurrence relies solely on the fact of Dailide's assistance "in the detention of Izrael and Riva Šoak" as meeting the standard for "assist[ing] the enemy in persecuting civil populations . . . ." If we were simply looking at an abstract definition of "persecution," I might agree, though I would be much more comfortable doing so after a judge had held a trial. However, we do not look at the issue in the abstract, but with the help of voluminous materials submitted by both sides. Those materials show that the question of whether Dailide was an armed officer or not might well have been crucial on the IRO's contemporaneous determination. And the record shows that there is a genuine issue of material fact as to whether he was armed.

The government attempts to construct an objective standard for "persecution." Rather than trying to define it directly — a problematic enterprise at the margins — the government argues that contemporaneous decisionmakers would have regarded Dailide's conduct as sufficiently persecutory to bar him from receiving displaced-person status.

To this end, the government offers a deposition by Michael Thomas, who was the chief eligibility officer of the IRO from 1948 to 1950, and the author of the Eligibility Manual. The manual was mandatorily followed, and thus might have provided a basis for the objective standard; if Dailide was a persecutor by IRO standards, he never would have made it through the rest of the process. Unfortunately, the Manual does not define persecutors.

historian. In his deposition Arad says, referring to a report that formed the basis of the affidavit, that he wrote the parts about the German occupation and German policy himself, but that he prepared the section on the Lithuanian Police (the heart of the matter) "jointly" with MacQueen, the OSI historian. Arad also said that OSI edited the report for linguistics and style, presumably because Arad's primary language is Hebrew. In sum, Dailide says that Arad's crucial testimony — crucial because it links the *Saugumas* to the Nazis and thus to the persecution and death of Jews — cannot be used.

Dailide offers several arguments for this conclusion, each of which I would reject. First, Dailide argues that the testimony improperly relies on OSI-sponsored translations. But the individual translation "problems" that Dailide asserts, discussed more fully elsewhere, are all either unconvincing or immaterial. Second, Dailide implies that if the Arad affidavit is based on MacQueen's input, it is fraudulent to pass it off as Arad's sworn testimony based on personal knowledge. But Arad only ever said that he prepared the report jointly with MacQueen, as opposed to the affidavit. More importantly, Arad says only that the two men worked *together* in Vilnius reviewing the documentary evidence, not that MacQueen wrote the relevant section himself. Most importantly, Arad cites this documentary evidence in the affidavit, and he swears that the affidavit is true. Even if we accept Dailide's account of MacQueen's role here, Arad's attestation, combined with his personal exposure to the documentary evidence upon which it is based, and his prior knowledge of the *Saugumas* based on other, German documents, is sufficient to make his testimony admissible.

Dailide also places great stress on the fact that Arad never mentioned the *Saugumas* in his book on the Vilnius Ghetto. True enough. Dailide twists context, however, taking the fact that the *Saugumas* did not participate in running the ghetto *internally* or police its *insides*, and using this to imply that this conflicts with the evidence that the *Saugumas*

then ask the prisoner various questions, including the prisoner's history and the reason for his arrest.

At the time of Dailide's interviews, the jails were overcrowded. There was a need to screen prisoners and separate out the innocently arrested from the serious offenders as defined by the Germans, – i.e., criminals, Communist functionaries, politruks, and others the Germans considered "riffraff" – so that the serious offenders could be liquidated. As stated by Dr. Arad, the data that Dailide obtained from his interviews was used to determine which prisoners would be released and which prisoners would be liquidated, and according to SS Colonel Jaeger, the task of interviewing the prisoners held at the Lukiskes Prison was one of the *Einsatzkommando's* most important tasks in fulfilling the Nazi regime's ultimate goal of genocide. Thus, it is reasonable to conclude that to prisoners held at Lukiskes, the answers that they provided to Dailide during his interrogation determined whether they lived or died. Although it is true that this Court is not bound by the Eastern District of Pennsylvania's holding in *Osidach,* we embrace the *Osidach* court's sound reasoning and analysis. We decline the dissent's invitation to put form over substance and ignore the *Osidach's* court's logic and legal acuity, particularly under the compelling and undisputed facts of this case.

In addition, we disagree with the dissent's contention that a genuine issue of fact exists for trial as to whether Dailide assisted the *Saugumas* in the persecution of Jewish civilians because Dailide claims that he was not armed when he interrogated the prisoners at Lukiskes, inasmuch as he was not issued the weapon until he was assigned to do field work in 1942. We do not believe that Dailide's being armed or unarmed at the time of the interrogation rises to the level of a genuine issue of material fact for trial. The issue of Dailide's assistance in the persecution of innocent Jewish civilians is not dependant upon whether he was armed at the time; rather, it is Dailide's acts as a uniformed member of the *Saugumas* which are at issue. Reviewing such acts, it is undisputed that Dailide was a uniformed member of the

*Saugumas* when he interviewed the prisoners, that he was accompanied by a guard when escorted to the prisoners' cells, and that the prisoners were put to death depending upon how they answered the questions asked of them.  Accordingly, whether Dailide was armed or unarmed, these defenseless Jewish civilians were at his mercy.  It is irrelevant whether Dailide actually "pulled the trigger" in this chain of genocide where his acts proved him to be an inextricable link in the ultimate result — the death of innocent Jewish civilians.  *See Anderson,* 477 U.S. at 248 (finding that a fact is "material" for purposes of summary judgment only if its resolution will affect the outcome of the lawsuit).

It is impossible for this Court, or any free citizen of the United States who has never known the fear of being occupied by an enemy, to fully appreciate the terror and sense of desperation that must be felt by the mere presence of an enemy official, particularly at the time of the Nazi regime.  However, to the best that anyone standing in our shoes is able to do so, we find that Dailide's acts of interrogating these defenseless prisoners — who had been forced to suffer the physical atrocities of living in the ghettos — to be the height of mental persecution.  These defenseless prisoners, whose only offense was escaping from the plight of the ghettos, knew of the genocide at the time and realized that they could fall prey to Adolf Hitler's goal depending upon how they answered the questions Dailide asked of them.[7]

Although we hold that Dailide's admission of interviewing prisoners in this case to be sufficient as a matter of law to find that Dailide assisted in the persecution of Jewish civilians, we are further persuaded in our decision by four documents presented by the government.

---

[7] The dissent's claim that Judge Nelson does not express an opinion on this line of reasoning is wrong.  Judge Nelson expressly states in his concurrence that he concurs in "the affirmance of summary judgment for the United States and in most of the reasoning . . . aptly set forth" in this part of the opinion.

and role of the *Saugumas*, particularly its role in persecuting the Jews of Vilnius.  His testimony is based in part on primary sources, including some of the ones quoted above.  Arad testified against John Demjanjuk, *see In re Demjanjuk*, 612 F. Supp. 544, 551 & n.4 (N.D. Ohio 1985) (speaking only of Ivan the Terrible in Treblinka, and not mentioning Demjanjuk), and, more relevantly, against Lileikis, *see Lileikis*, 929 F. Supp. at 37–38 (rejecting challenge to Arad's credibility and noting that Arad's testimony against Demjanjuk was not part of that which was discredited), in whose case he offered much of the same testimony as he does here.

Dailide first says that Arad lacks personal knowledge of the events about which he is testifying, in violation of FED. R. CIV. P. 59(e).  While Arad lacks contemporaneous, first-hand knowledge of life in Vilnius during the war, he is testifying as an expert witness, not a fact witness.  Any evidence that would be admissible at trial can be presented in an affidavit.  *See* 11 MOORE'S FEDERAL PRACTICE § 56.14[1][d] (3d ed.).  Expert or "opinion" testimony is, by definition, not based on first-hand knowledge.  Put another way, the "opinion" in the testimony is the personal "knowledge," and should be admissible so long as the court is made aware of the facts or expertise on which the opinion is based, and so long as the opinion is an informed one and belongs to the affiant.  In this case, Arad's affidavit is adequately footnoted, referring back to the documents on which he relied, and Dailide has not challenged any of these citations.  *See M & M Med. Supplies and Service, Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160 (4th Cir. 1992) ("[A]n affidavit that states facts on which the expert bases an opinion satisfies FED. R. CIV. P. 56(e) even though the expert does not attach the data supporting the facts.  If need be, the court, acting pursuant to FED. R. CIV. P. 56(e) and FED. R. EVID. 705, can require the expert to furnish the supporting data."); *Shaw v. Strackhouse*, 920 F.2d 1135, 1139 (3d Cir. 1990) (similar).

Dailide next argues that Arad's affidavit appears to have been prepared at least partly by Mr. MacQueen, an OSI

His first attack is on the translations of the above-recited documents offered by the government. He correctly notes that none of the government's witnesses are fluent in Lithuanian, and that therefore they had to rely on the official government translations, though he does not challenge the qualifications of the government's official translators. Dailide himself, as well as two of his witnesses, are fluent in Lithuanian, and therefore have a certain additional (if not necessarily sufficient) level of credibility. As mentioned above, Dailide contends that the "arrests" were mere detentions, and that the "searches" of detainees were of apartments, not persons. The first quibble is not borne out by the context of the documents, and that the second is immaterial.

Dailide also attacks the government's claims that the *Saugumas* had a Communist-Jews Section. Government witnesses testified that references to such a section appear throughout the documents they reviewed. None of these documents are before us, however, and Dailide says that the section was known only as the Communist Section. However, other than reflecting on the credibility of the government's witnesses (a consideration that is irrelevant at the summary-judgment stage), the name of the section is immaterial.

Next, Dailide argues that the references to "Jews" and "Poles" in the documents, and used as evidence of persecution, have been misconstrued by the government. Rather than evidence of persecution of Jews *qua* Jews, Dailide says that these references are merely identifying adjectives, essential in a multi-cultural environment, and analogous to references to ethnicity in modern police reports. This may well be true at some level, but the Jews in question were clearly being arrested for trying to escape from the ghetto.

Dailide's heaviest attack is on the government's expert witness on the nature of the *Saugumas*, Dr. Yitshak Arad. Arad, the author of a doctoral dissertation and book on the Vilnius Ghetto, submitted a lengthy affidavit on the nature

Document 1, the Milinavicius Report dated October 31, 1941, states in relevant part:

> It has been reported to me that two Jews, IZRAEL SOAK and RIVA SOAK, are staying overnight at Apt. 2, 51 Krokuvos Street, the residence of LEON LEJSAK, a citizen of Polish nationality. They have escaped from the Ghetto with the objective of leaving for Beniakonys. They were waiting for a truck at the residence of the above listed Pole. LEON LEJSAK probably has contacts with Jews, and he himself said that he knew that they were waiting for a car. Officers LEONAS KAULINIS and *ALGIMANTAS DAILIDE* took part with me. We conducted a search and arrested (*sulaikyti*) the Jews on 30 October.

(J.A. at 136.) (emphasis added). Dailide argues that the government mistranslates the word *sulaikyti* to mean "arrest" rather than "detain," and that the above document suggests that a "personal" search was done rather than a search of the premises. Regardless of which translation is applied, the record indicates that the Jews were taken into custody and placed in prison; therefore, they were "arrested' in every sense of the word.[8]

Document 2, the Regina Report, dated October 31, 1941, states that several officers, including Dailide, detained twelve Jews attempting to escape from Vilnius in the direction of Lyda. The list of Jews detained included the Soaks mentioned in the Milinavicius Report. The report further states that "[a]ll were transported to the Security Police; a

---

[8]Dailide argues that the government misconstrues the reason why words such as "Pole" and "Jew" were used in *Saugumas* documents. The government used these references as evidence of persecution. Dailide claims, however, that this terminology was not used for those purposes, but instead as identifying adjectives, noting that similar identification procedures are used in the police departments in the United States. Regardless of the intended purposes, it is clear that the Jews referred to in the four documents presented by the government were being arrested for trying to escape from the ghetto.

personal search was performed, and they were placed into the jail." This report clearly rebuts Dailide's contention that the Jews were merely detained and then released.

Document 3, the List of Jews Arrested by the Lithuanian Security Police, dated November 5, 1941, indicates that the Soaks and the other ten Jews still remained incarcerated as of November 5, 1941. The report ends by stating that all the Jews are in the Lukischkiai Prison and at the "disposition of the German authorities".

Finally, Document 4, the Dailide Report dated November 3, 1941, states that Dailide executed a personal search of "the Jew Mark Sapyro." Dailide inventoried several items including money which was turned over to the Germans. Mark Sapyro was listed on Document 3 as Mark Sapiro, and thus, was at the "disposition of the German authorities", as well. According to Dr. Arad, this "handover to the German Security Police . . . almost inevitably meant death by shooting at Paneriai."

Furthermore, two affidavits in the record also support the conclusion that Dailide assisted in the persecution of Jewish civilians, and thus was not eligible for a visa. The affidavit of Daniel Ashe, Case Analyst for the DPC from December 1948 to September 1949, stated that if any one of the allegations by the government were true (i.e., Dailide's active service in the Nazi controlled *Saugumas*, and Dailide's individual conduct such as arresting and inventorying the possessions of Jews), Dailide would not have been eligible for admission into the United States. The affidavit of Michael Thomas, Chief Eligibility Officer for the entire IRO and co-author of the IRO Manual, states as follows:

[A]n applicant for IRO relief who had served in the Lithuanian Security Police during the Nazi occupation and (1) participated at any time as an armed police officer in the arrest of Jews attempting to escape the Vilnius ghetto or (2) participated as an armed police officer in the search of one or more Jews and/or confiscated their money to be turned over to Nazi

Security Police." The entry in the German document for October 30 parallels the second Lithuanian document, with the same 12 Jews listed. Dailide does not argue that *festgenommen* means anything other than "arrested," probably because at the end of the list it is stated that "[a]t this time, all the Jews are in the Lukischkiai Prison and are at your disposition." Dailide does point out, though, that there is no direct evidence that anything sinister befell these people once they were sent to the prison. None of the prisoners mentioned above, *supra* at 37, as being "dealt with according to orders" [*i.e.*, killed] appear on this arrest list. Furthermore, as Dailide notes, at least one person on the list managed to live long enough to die in Miami in 1996. See deposition of MacQueen, R. 99, Exh. C, at 52-56.

The final piece of evidence in the record cited by the government is a report written by Dailide himself. It is an inventory from a personal inventory search he performed (or recorded, see Dailide 1995, dep. tab 118 to Gov't Motion for Summary Judgment, at 141-43) on Mark Šapyro, a Jew. The search was done after an "arrest" [*sulaikyta*], though the context here can also imply that, as Dailide argues, *sulaikyta* only means "detention." The items included 2,443.50 rubles, turned over to the Germans, and a passport, which was kept from Šapyro as well. Also included were permits, photos, a wallet, and a pocket knife, which were given back to Šapyro. Letting a suspect keep these items if he was going to jail appears unlikely, though Šapyro is found on the German list of arrestees. His ultimate fate is unclear from the record. This evidence is thus somewhat muddled.

At minimum, however, there is ample evidence that Dailide did participate in arresting Jews whose only "offense" was trying to escape from the ghetto; and that Dailide performed an inventory search of Šapyro, whose passport was withheld and whose rubles were turned over to the Germans.

B

Dailide offers a scattershot attack on the government's evidence.

were detained." The meaning of *sulaikyti* as either "arrest" or "detain" is thus disputed, as discussed below.

Another report in the record bolsters the first document, as well as the government's translation of *sulaikyti*:

> To the Chief of Lithuanian Security Police, Vilnius Province Report
> I inform you that on 30 October of the current year, in agreement with EDVARDAS RAICEVIČIUS (the informer) and together with the following officials: SKAUSGIRDAS, KAULINIS, MILINAVIČIUS, DAILIDĖ, [and] DVILINSKAS at 7:00 p.m. we detained [*sulaikéme*] the following individuals of Jewish nationality who were escaping from Vilnius in the direction of Lyda:
> [List of 12 names including IZRAEL ŠOAK and RIVA ŠOAK].
> All were transported to the Security police, a personal search was performed, and they were placed into the jail.
> The arrests [*sulaikymas*] took place exactly in the same order as the first one. The difference was that SKAUSGIRDAS went along to collect the Jews in Vilnius together with the driver, to guarantee that the car would not be stopped [*sulaikyta*] by the public police or by German police and the task would be carried out without disturbance.
> The same plan will be carried out in the case of other Jews attempting to escape.

At the very least, Dailide admits that he was involved in an operation to detain the Jews at the scene and send them back to the ghetto. The fact that these detainees were jailed, though, gives the lie to Dailide's claim that the Jews were only detained and then released.

So does a third document, this one in German, and written by Lileikis. It is entitled *Verzeichnis der Juden, die von litauscher Sicherheitspolizei festgenommen wurden*, translated as "List of Jews Arrested by the Lithuanian

authorities, would have been ineligible for IRO relief under Part II (a), Annex I of the IRO Constitution, which precluded giving IRO relief to those who assisted the enemy in persecuting civil populations.

(J.A. at 641.)

We find that these documents show that no genuine issue of material fact remains for trial that Dailide assisted the *Saugumas* in the persecution of Jewish civilians, particularly when coupled with his admission as discussed earlier. Clearly, Dailide's acts, as detailed in these documents, went well beyond the innocuous (such as the barber who worked for the *Saugumas* and cut the Jewish prisoners' hair); rather, Dailide's actions provided an inextricable link in the Nazi regime's chain of genocide. Accordingly, because Dailide assisted in the such persecution, he did not obtain a valid visa into the United States as a matter of law. *See Fedorenko,* 449 U.S. at 505.

We reject the arguments that these documents merely show that Dailide participated in "rounding up" or detaining Jewish civilians trying to escape from the ghettos, and that "persecution" is nowhere defined either literally or figuratively for purposes of barring him from receiving displaced-person status. It is not difficult to see the fallacy of these arguments which we find to be contrary to the requirements of the naturalization process. By arguing that "persecution" is not adequately defined, the dissent seems to be making the illogical and unreasonable claim that "rounding up" Jewish civilians for purposes of turning them over to the Nazis for imprisonment or death does not satisfy the commonly understood definition of "persecution." To say that a reasonable person could conclude that Dailide's acts, as made known through these documents, would not have been regarded as sufficiently persecutory to bar him from receiving displaced-person status is completely unpersuasive. Contrary to the dissent's contention, the issue here does involve whether "Nazis are evil;" indeed, it is the Nazis' "evilness" in persecuting civil populations which makes assisting them in

such acts a basis for denaturalization. But for Dailide's efforts in assisting the Nazis in their evil enterprise, we would not be visiting this issue today, nor would Dailide have had reason to lie when he applied for his visa to gain entry into this country, as will be discussed in the next section.

## V.

### Whether Dailide Willfully Misrepresented Material Facts about his Wartime Activities

Dailide argues that the lower court erred in finding that no genuine issue of material fact remained for trial that he misrepresented facts about his wartime activities when applying for an immigration visa. Once again, we disagree.

Section 10 of the DPA states the following: "Any person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States." The phrase "misrepresentation for the purpose of gaining admission into the United States" has been defined as wilful misrepresentation, oral or written, to any "person while he is charged with the enforcement or administration of any part of the act, of any matter, material to an alien's eligibility for any of the benefits of this act." 8 C.F.R. § 700.11 (1950).

When applying for his DPA visa, Dailide completed a personal history form prepared by CIC. The CIC conducted investigations and interviews of applicants on behalf of the DPC, which administers the DPA. DPC case analysts were responsible for reviewing all of the documentation concerning each applicant to determine the applicant's eligibility and desirability to enter the United States. According to Ashe, standard procedure called for the analysts to review the file of an applicant, including information received from the CIC and other agencies. The DPC case analyst usually did not interview the applicants again. After reviewing the information contained in an applicant's file, the DPC case analysts prepared a final report. If the application was

rather than "constant control." Nevertheless, contrary to Dailide's argument, the passage still shows that the Germans staffed, purged, and directed the *Saugumas*.

The government alleges specifically that the Communist Section, of which Dailide was a member, helped to enforce the ghettoization of Vilnius's Jews. The district court apparently reviewed evidence that in 1941, certain Jews were arrested by the *Saugumas* for the "crime" of escaping from the ghetto, and were imprisoned at Lukiski, transferred to German custody, and killed. The record before this court has a German-language record of these people being arrested and "dealt with in accordance with orders" a few weeks later, along with expert testimony backing up this account of procedures. The account of the killing of some of these same people is also discussed in *Lileikis*, 929 F. Supp. at 36.

Second, the government offers evidence of Dailide's personal involvement. The record contains the following report written by Adolfas Milinavicius, translated from Lithuanian (here using the government's suggested translation):[2]

> It has been reported to me that two Jews, IZRAEL ŠOAK and RIVA ŠOAK, are staying overnight at Apt. 2, 51 Krokuvos Street, the residence of LEON LEJSAK, a citizen of Polish nationality. They have escaped from the Ghetto with the objective of leaving for Beniakonys. They were waiting for a truck at the residence of the above listed Pole. LEON LEJSAK probably has contacts with Jews, and he himself said that he knew that they were waiting for a car. Officers LEONAS KAULINAS and ALGIMANTAS DAILIDĖ took part with me. We conducted a search and arrested the Jews on 30 October.

Dailide translates the last sentence (*Krata daryta ir žydai sulaikyti*) as "Search [of the apartment] was done and jews

---

[2] The original documents are in the Lithuanian State Archives, which authenticated this and the other records cited below.

Dailide to obtain refugee status, and by extension displaced-person status, a visa, and citizenship. Second, also as cited above, the Displaced Persons Act renders inadmissible anyone who willfully misrepresents material facts for the purposes of gaining admission into the United States as a displaced person.

A

The government's charge that Dailide "assisted in persecution" has a factual predicate of two parts. First, in its original complaint, the government said that the *Saugumas* persecuted civil populations, and that Dailide assisted the *Saugumas*. There is a document in the record, written by a German *Einsatzgruppe* commander in October 1941, that bolsters the first portion of this syllogism:

> [A] Lithuanian Security and Criminal Police[1] force was created. . . . [A]fter careful investigation the extra auxiliary personnel needed was brought in. The Lithuanian Security and Criminal Police operates according to the orders and guidelines provided to them by *Einsatzkommando* 3 and its activities are under constant surveillance [*kontrolliert*] and, as much as possible, they are used for security police work which cannot be performed by the *SD*'s own personnel, particularly searches, arrests, and investigations. . . .
>    . . . . After the removal of the accused and unfit personnel and under the constant surveillance of *Einsatzkommando* 3, the Lithuanian Security and Criminal Police produced entirely satisfactory work . . . .

Dailide's translation changes the German word *kontrolliert* to "surveillance," rather than "control" as in the government's translation. The portion quoted above thus conforms to Dailide's preferred translation, saying "constant surveillance"

[1]Dailide quibbles with parts of the translation of this document, as discussed below, but does not challenge the notion that the "Security and Criminal Police" referred to here is the *Saugumas*.

approved, it was then forwarded to a Vice Consul for further review. If the application was approved by a Vice Consul, an immigration visa was authorized.

Here, Dailide claimed on his personal history form that during the years 1942 through 1944, he was employed as a "practitioner forester" in Vilnius, Lithuania. In addition, Dailide's personal history form also indicates that he denied any police service membership. This form was sent by the CIC, with other relevant documents to the DPC. The DPC's final report prepared by a case analyst, repeats the "practitioner forester" misrepresentation virtually verbatim.

While acknowledging these statements in his personal documents, Dailide claims that they do not constitute wilful misrepresentations because he concealed his membership in the *Saugumas* for fear of repatriation to the Soviet Union. We are not persuaded by Dailide's argument where it has been found that an individual giving "false information in connection with his application for a DPA visa so as to avoid the possibility of repatriation to the Soviet Union" has made a willful misrepresentation for the purposes of § 10 of the DPA. *Fedorenko,* 449 U.S. at 507. In addition, because we have concluded that Dailide's individual conduct of assisting the *Saugumas* in the persecution of Jews would have rendered him ineligible for a visa, we also find that such wilful misrepresentations were material. *See id.* (finding that § 10 of the DPA only applies to willful misrepresentations about "material" facts, and that a misrepresentation is material if disclosure of the true facts would have made the applicant ineligible for a visa).

Dailide argues, however, that he did not violate § 10 of the DPA because his alleged misrepresentations were to the CIC, an organization that is not "charged with enforcement or administration" of the DPA. Dailide notes that the misrepresentations appeared on the CIC questionnaire, which was included in his CIC file; thus, he argues that since he did not make misrepresentations directly to the DPC, an

organization charged with administration of the DPA, he did not violate § 10 of the DPA.

In support of the foregoing contention, Dailide cites several decisions from the Bureau of Immigration Affairs ("BIA"), and a 1951 letter from Attorney General McGrath to the Chairman of the BIA ("McGrath Memorandum"). We find only two of the BIA cases to be relevant: *In re Suess et al.*, Nos. A-7927755-57 (Sept. 26, 1951), *approved by Att'y Gen.* (Oct. 16, 1951), and *In re Altman et al.*, Nos. A-7991300-01 (Sept. 26, 1951), *approved by Att'y Gen.* (Oct. 16, 1951).

In *Suess*, the applicant admitted that she deliberately, knowingly, and falsely informed the representatives of the IRO and the CIC that she resided in Germany during a period of her absence from Hungary. She claimed she falsified her whereabouts for fear that she would be denied entry into the United States under the DPA. The applicant voluntarily disclosed her falsity when she made a sworn application for a visa. The BIA held that the CIC was not charged with enforcement of the DPA, but only with assisting the DPC in carrying out its responsibilities. Therefore, inasmuch as the misrepresentation was only made to the CIC, the BIA held that the applicant did not violate § 10 of the DPA.

Similarly in *Altman*, the applicants misrepresented to both the IRO and the CIC exactly when they entered Germany. That information was passed to the DPC. A DPC case analyst reviewed the documentation, and disqualified the applicants, not because of the misrepresentation, but for lack of required residence in Germany. Thereafter, the case was renewed, the applicants were called before the case analyst and placed under oath. They revealed the true facts, and confessed to the false statements. Citing *Suess*, the BIA held that since the applicants never gave false statements to the DPC, § 10 of the DPA did not apply. However, it was noted that had the applicants persisted in their false statements before the DPC case analyst, a different result would have occurred.

The *Suess* and *Altman* cases can easily be distinguished from the case at hand. In both of these cases, the DPC never

Nazis in arresting, detaining, and delivering thousands of Jews to the death squads." *Lileikis*, 929 F. Supp. at 36. In the second case, the defendant was a Hungarian pro-Nazi propagandist and convicted war criminal, whose newspaper "played a prominent role in calling for Hungary's adoption of increasingly drastic anti-Jewish restrictions." *United States v. Koreh*, 59 F.3d 431, 436, 440 (3d Cir. 1995). Finally, in the third case cited, the defendant was a uniformed guard at the Mauthausen concentration camp and member of the SS *Totenkopf-Sturmbann* (Death's Head Battalion). *United States v. Leprich*, 666 F. Supp. 967, 967 (E.D. Mich. 1987). As discussed below, Dailide's actions, though hardly above reproach, do not rise near to this level, and thus cannot as easily be declared sufficient *as a matter of law*. *Cf. United States v. Lindert*, 907 F. Supp. 1114 (N.D. Ohio 1995) (concluding, after trial, that an armed SS member who served as a concentration camp perimeter guard did not participate in persecution and thus did not lack "good moral character" sufficiently to warrant denaturalization).

### III

The following interplay of statutes forms the legal basis for this action. According to 8 U.S.C. § 1451(a), if a naturalization is illegally procured, that citizen loses his citizenship. Illegal procurement exists when "some statutory requirement which is a condition precedent to naturalization is absent at the time the petition [for naturalization is] granted." *Fedorenko*, 449 U.S. at 515 n.38 (*quoting* H. R. REP. NO. 1086, 87th Cong., 1st Sess., at 39 (1961) (alteration in *Fedorenko*)). One of the statutory conditions precedent is that the applicant was "lawfully admitted" to this country for permanent residence. 8 U.S.C. § 1427(a)(1).

The government claims two bases for concluding that Dailide was unlawfully admitted. First, as cited above, the IRO Constitution excludes from its protections any person who can be shown "to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations." Without IRO protection, there was no way for

Denaturalization actions present extremely serious problems. They involve not only fundamental principles of our political system designed for the protection of minorities and majorities alike. They also involve tremendously high stakes for the individual. For denaturalization, like deportation, may result in the loss of all that makes life worth living. Hence, where the fate of a human being is at stake, we must not leave the presence of his evil purpose to conjecture.

*Knauer v. United States*, 328 U.S. 654, 659 (1946) (Douglas, J.) (quotation marks omitted).

More specifically, the Supreme Court has long made it clear that the government "carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship," *Costello v. United States*, 365 U.S. 265, 269 (1961), and so the government must present "clear, unequivocal, and convincing" evidence supporting denaturalization, *Fedorenko v. United States*, 449 U.S. 490, 505 (1981).

B

The government's task is even more difficult when it seeks, as it did here, to win its case at summary judgment. Our summary-judgment standard requires that there be no disputed issues of material fact; that we view the facts in the light most favorable to Dailide; and that the government prevail only if it is entitled to a judgment as a matter of law upon such a view of the facts. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48 (1986).

Although the district court suggested that there is precedent for summary judgment in cases such as Dailide's, 953 F. Supp. at 195, the cases it cited as examples are all distinguishable in that the roles of their respective defendants were much more clearly established and more clearly persecutory. In the first case cited, that of Lileikis, the defendant was the head of the Vilnius division of the *Saugumas* and did not "deny that he personally ordered the Saugumas officers under his command to cooperate with the

relied on the misrepresentations because the applicants recanted their statements before approval by the DPC. Here, Dailide never recanted the statements made to the CIC. As noted in the *Altman* decision, without the applicants' recantation, they would have been found liable under § 10 of the DPA. Moreover, it is clear the DPC relied on Dailide's misrepresentations; the DPC report repeats almost verbatim the false employment history of Dailide.

Furthermore, the above cases can be distinguished because they dealt with misrepresentations concerning residency and should be limited to only that situation. The McGrath Memorandum buttresses this point in stating as follows regarding the interpretation of the *Suess* and *Altman* decisions:

At the time I approved the Board's orders in these cases, my decision was necessarily based on the individual records presented to me for review. Since the receipt of your memorandum I have reexamined the entire question and have had discussions with members of my staff. Had I had the additional background information furnished in your memorandum, as well as the discussions had with my staff, at the time I considered the Suess and Altman cases, *I might have arrived at a different conclusion*. However, in view of the fact that many cases probably have already been processed in the light of these decisions and the fact that the program is drawing to a close, I am not disposed to disturb these decisions at this time. The decisions, however, should be *limited to stand for the following propositions*:

(1) *A misrepresentation as to residence*, is a misrepresentation as to a material fact and when made to the Displaced Persons Commission, to a United States Consul, or to the Immigration and Naturalization Service, constitutes a misrepresentation within the contemplation of Section 10 of the Displaced Persons Act.

(2) *Such misrepresentation* to the Counter Intelligence Corps of the United States Army, even if wilfull [sic] and as to a material fact, is not a misrepresentation within the contemplation of Section 10, since the Counter Intelligence Corps is not an agency charged with the enforcement or administration of the Displaced Persons Act.

(J.A. at 410.) (emphasis added).

Attorney General McGrath notes in his memorandum that had he contemplated the question further, before rendering a decision, he may have reconsidered his approval of these cases. In light of this fact, McGrath limits the holding of these cases to apply only in situations of misrepresentations of residency. In addition, the McGrath Memorandum expressly states that the holdings in both *Suess* and *Altman* are limited to misrepresentation "as to residence."[9] Because Dailide's false statements concerned his involvement in the persecution of civilian populations, not residency, neither *Suess* nor *Altman* support Dailide's contention.

## VI.

For the foregoing reasons, we **AFFIRM** the district court's order granting the government's motion for summary judgment on Counts I and IV of the government's complaint. In doing so, we are mindful of the heavy burden placed upon the government in a denaturalization proceeding; however, we are also mindful of the requirement for Dailide to have strictly complied with congressionally imposed prerequisites of

---

[9]The dissent's attempt to expand Attorney General McGrath's position by making the bald-faced assertion that "the bare fact of a false statement to the CIC does not violate Section 10" based on this Memorandum is without support in the record. Attorney General McGrath expressly limited the holding of *Suess* and *Altman* to those material misrepresentations as to "residency." The Attorney General could easily have adopted the BIA's answer to the posed question which would have included all false statements to the CIC, but he expressly declined to do so.

December 7, 1994, the government filed a six-count complaint that charged Dailide with illegal procurement of United States citizenship and that sought to revoke Dailide's citizenship and cancel his Certificate of Naturalization. The government then filed for partial summary judgment on counts I and IV. Count I alleged that Dailide had assisted in persecution, in violation of the Constitution of the IRO, 62 Stat. 3037, 3051–52 (1948), and in violation of 8 U.S.C. § 1427. Count IV accused Dailide of material misrepresentation, in violation of the Displaced Persons Act, 62 Stat. 1009, 1013 (1948), and of 8 U.S.C. § 1427.

In December 1996, the district court announced that it would grant summary judgment against Dailide on the two counts. In February 1997, the court entered an amended order granting summary judgment, *United States v. Dailide*, 953 F. Supp. 192 (N.D. Ohio 1997), and the remaining counts were dismissed without prejudice.

Dailide filed this timely appeal.

## II

### A

A decision to reverse the district court is a difficult one. There is significant evidence that Dailide helped to arrest Jews fleeing from the ghetto, most of whom were probably killed by the Nazis soon afterward. Dailide lied at times about some of his activities. I would not vindicate Dailide in either the legal or moral senses of that word, and the government might well be able to prove at trial that Dailide should be stripped of his citizenship. Nevertheless, I believe the law is clear that the district court erred in granting the government summary judgment without the type of full trial necessary to determine genuine issues of facts material to the legal (if not the moral) issues in this case.

This conclusion is not a novel one. As the Supreme Court said, newly cognizant of the evils of World War II:

things, apprehending and interrogating Jews and those who assisted them.

## B

In 1944, the Soviet Army swept back into Lithuania. Dailide fled to Germany, where he lived in the American sector until 1950. He and others discussed whether they should reveal their *Saugumas* service in applying for emigration, and decided against it. Dailide's emigration process had three steps. First, he had to qualify as a refugee within "the concern" of the International Refugee Organization (IRO). IRO Constitution, 62 Stat. 3037, 3051 (1948). Then he had to receive a determination of displaced-person status by the DPC (Displaced Persons Commission). Finally, he had to qualify for and receive a visa from the United States Department of State.

In 1949, apparently after qualifying as a refugee (a status conferred by an IRO field eligibility officer, applying the standards of the IRO Constitution), Dailide completed a questionnaire from the United States Army counter-intelligence corps (CIC), as part of his application for displaced-person status. Although he says that he was not the one who physically filled out the form, he does not deny that he signed it. The questionnaire asked Dailide for an "[e]xact description" of his activities during the war. Dailide said that from 1942 to 1944, he had been a "practitioner forester" in Vilnius. Asked if he had been a member of any police service or civil service, Dailide answered "No." Dailide eventually received displaced-person status. In 1950, Dailide applied for an immigration visa under the Displaced Persons Act. Dailide received his visa, moved to Ohio, and received citizenship in 1955.

## C

When the Soviet Union collapsed, *Saugumas* records became available to outside investigators. In July 1993, INS agents and Office of Special Investigations (OSI) personnel interrogated Dailide at his office in Cleveland. On

citizenship. Under these facts, we cannot imagine a more compelling case for finding noncompliance as a matter of law, where no genuine issue of material fact remains that the government's overwhelming evidence against Dailide is "clear, unequivocal, and convincing." For us to find otherwise under these facts would be a travesty and would serve no purpose but to allow a persecutor who willfully participated in Adolf Hitler's attempt to eliminate the Jewish population through genocide to enjoy the fruits of being a United States citizen -- no greater insult could be done to the spirit and purpose of the principles upon which this country was built.

Parenthetically, it must be said that the dissent's attempt to minimize the force of the opinion and holding of the majority by pointing out that Judge Nelson's concurrence rests on his agreement that Dailide assisted the enemy in the persecution of civil populations is out of line and misplaced. First, contrary to the dissent's mischaracterization, Judge Nelson's concurrence does not rest solely on Dailide's participation in the arrest of two Jews fleeing the Vilnius ghetto. Rather, an accurate reading of Judge Nelson's concurrence indicates that he concurs in the affirmance of summary judgment for the United States as well as in "most of the reasoning . . . ably set forth in Part IV" of this opinion. Accordingly, the reasoning of the concurrence is not limited to "the minimum ground" that Dailide assisted in the arrest of two Jews. Second, the concurrence expresses no opinion one way or the other as to whether Dailide made willful misrepresentations of material fact in gaining entry into this country; therefore, although the concurrence does not expressly agree with the position set forth in this opinion, it does not agree with the dissent's position either. Finally, the government may prevail in this case by proving *either* Count I or Count IV; it need not prove both counts against Dailide. Thus, the dissent's opening "clarification" that when it refers to this opinion as being "of the court" only to the extent of Judge Nelson's concurrence, shows nothing except perhaps the dissent's dissatisfaction in not having its viewpoint prevail in this case.

---

**CONCURRENCE**

---

DAVID A. NELSON, Circuit Judge, concurring in part. I concur in the affirmance of summary judgment for the United States and in most of the reasoning, if not all of the rhetorical flourishes, ably set forth in Part IV of Judge Clay's opinion. There is no genuine issue over the fact that Dailide assisted in the detention of Izrael and Riva Šoak, Jews who had escaped from the ghetto and who were turned over to the Germans for imprisonment. In helping to deprive these individuals of their freedom – which he unquestionably did, whether he personally was carrying a sidearm at the time or not – I believe that Dailide "assisted the enemy in persecuting civil populations of countries, Members of the United Nations," within the meaning of those words as used in § 2(b) of the Displaced Persons Act of 1948. I express no view on the question whether summary judgment in favor of the government could also be affirmed on the basis of the misrepresentations Dailide made to the U.S. Army's Counter Intelligence Corps about his wartime activities.

for a brief period (he claims it was for about two weeks in late August). According to Dailide, the purpose of the Section was to obtain information on communists and potential revolutionaries. After his service in the Communist Section, Dailide was transferred to the Information Section, where he says his job was to gather background information on prospective employees to ensure that they were not communists. Around the end of 1942, Dailide states that he received a field assignment, for which he was issued a firearm — he notes that three officers were killed by communists — though there is no evidence that he ever used it.

Aside from these activities, it is clear from the record that the *Saugumas* also assisted the German invaders in their persecution of Lithuania's Jews, though Dailide claims he had no knowledge of any such link. He also says that he had no knowledge above the level of rumor of the murder of the Jews. Regardless of what Dailide knew or did not know, many of the Jews in Vilnius were arrested and sent to prison, then marched out in groups to Paneriai, a wooded area near Vilnius, and shot. By the end of 1941, 30,000 were dead. The remaining Jews were confined to ghettoes. One ghetto was liquidated in 1941, the other in 1943. In all, 55,000 Jews were killed. S*ee generally Lileikis*; *United States v. Balsys*, 918 F. Supp. 588 (E.D.N.Y. 1996), *vacated,* 119 F.3d 122 (2d Cir. 1997), *reversed by* 118 S. Ct. 2218 (1998).

The reconstituted *Saugumas* was placed under the control of the *Einsatzkommando*, the Nazis' mobile killing units, there being no Lithuanian civilian government to which the *Saugumas* would have reported after August 1941. Among their other duties, the *Saugumas*, plain-clothed police, were responsible for locating Jews hiding outside the ghetto, for capturing escapees, and for breaking up document-forgery rings. Arrestees were transferred to Lukiski prison and most were apparently killed, with contemporaneous records noting this euphemistically. The government states that the *Saugumas*'s Communist Section (which it calls the Communist-Jews Section) was responsible for, among other

and relied on by the court, there was a full trial, and a judge made findings of fact about what Osidach did.

On the other hand, in the case of *United States v. Lindert*, 907 F. Supp. 1114 (N.D. Ohio 1995), a man who was a gun-toting SS guard at a Nazi death camp was found, after a full trial, not to have assisted in persecution, because his specific acts were found to be sufficiently peripheral to the actual persecution. The government chose not to exercise its right to appeal from that verdict.

In short, Dailide may be a very bad man. In any event, he has much to answer for in a moral sense. But before we can strip him of United States citizenship, we must follow the rules, especially the rules that make summary judgment quite different from verdict after a trial. This is what the court overlooks today, and I therefore respectfully dissent.

## I

### A

Dailide was born in Lithuania in 1921. He was a student in forestry school in Vilnius when the Soviet Union conquered Lithuania in 1940. Not long after the annexation, Dailide was expelled from school for his opposition to communism.

When the Nazis invaded Lithuania in June 1941, the Lithuanian Security Police (known as the *Saugumas*) were reconstituted to help the invaders keep order by performing searches, arrests, and investigations. Dailide was hired as a *Saugumas* clerk in June. He claims that he worked in the office and, on occasion, interviewed arrestees brought in on their way to the nearby Lukiski prison.

Dailide became a *Saugumas* "police candidate" in August, around the time that the infamous Aleksandras Lileikis became the local *Saugumas* chief. *See United States v. Lileikis*, 929 F. Supp. 31 (D. Mass. 1996) (rejecting Lileikis's "just following orders" defense and revoking his citizenship). Dailide worked in the Communist Section of the *Saugumas*

## DISSENT

BOGGS, Circuit Judge, dissenting.

### PROCEDURAL SUMMARY

The district court granted summary judgment to the government on two grounds. I would reverse the district court because I believe that neither ground can be supported as a matter of law, and I explain why in my opinion below. In my dissent, I refer to Judge Clay's opinion as being that of "the court" though it is so only in its conclusion of affirmance and to the extent of Judge Nelson's concurrence. Judge Nelson's concurrence, based on the minimum ground that Dailide's participation, in whatever capacity, in the arrest of two Jews fleeing the Vilnius ghetto is sufficient to establish his legal status as a persecutor is, of course, the only holding of the majority of the court. As I also explain below, I would hold that such participation, when the circumstances are disputed and the legal import is unsupported, is an inadequate basis to strip an American citizen of his citizenship without a trial. I therefore dissent from the court's judgment and opinions.

### SUBSTANTIVE SUMMARY

Dailide was a member of the Saugumas and the Saugumas assisted the Nazis in committing atrocities and persecutions. The government has proven this conclusively. If that were enough to affirm the district court, this would be an easy case. But even the government does not seriously argue that this is enough, and the court correctly so holds, *supra* at 11.

Instead, to affirm the district court, we must find that there is no genuine issue of material fact as to Dailide's violation of the immigration laws. Contrary to the court's opinion, *supra* at 8 n.3, it is much harder to meet a burden "as a matter of law" when you must take all facts and inferences in the light

most favorable to the defendant, rather than having a trial and making findings of fact.

It may well be that Dailide should be denaturalized and deported, after a finder of fact has looked at all the evidence and made findings about who is lying and who is telling the truth. At this stage, however, our law does not allow the stripping of American citizenship from Dailide when many material factual matters are in dispute.

In very brief summary, the court errs on both of the key issues.

As to Count IV, misrepresentation, it is undisputed that Dailide signed a personal history form, taken by the Army Counterintelligence Corps (CIC), which was false in two major respects. It is also undisputed, or not affirmatively contended, that Dailide did not repeat this, or any other misrepresentation, on any subsequent document that he submitted to Immigration authorities – not on his visa application, or on any subsequent immigration or naturalization document. Nor does it appear that he made any misrepresentation when interviewed by the relevant Vice Consul, though that could be controverted.

So, the issue is whether this misrepresentation was made to one "charged with the enforcement" of the Displaced Persons Act as required by 8 C.F.R. § 700.11 (1950). On its face, the question appears to be in dispute. There is nothing on the CIC form that says it is for immigration purposes. Nothing on any subsequent form asked that he affirm the CIC form. As detailed at greater length *infra* at 49-52, the Attorney General at the relevant time specifically held that the CIC was not such an agency. The court relies on the fact that the circumstances in those cases can be distinguished factually, but the differences in factual circumstances cannot alter the general role of the CIC, as held by the Attorney General.

If the question were whether a particular police officer had general arrest powers in a certain town, and there were a binding precedent that he did not, the fact that the earlier case

involved a robbery and the case at issue involved a homicide would not invalidate the earlier precedent.

If factual development and findings were to prove that in completing the CIC form, Dailide knew that he was in fact submitting the material for consideration by the DPC, then it might be that he could be held to have knowingly misrepresented to someone "charged with enforcement" of the act. But again, the government does not argue, at this stage, that such is true as a matter of undisputed fact, only that, in general, the CIC forms were relied on by the DPC.

The second issue, the charge of assisting in persecution under Count I, is even more bound up in disputed facts. Again, after a trial, it may well be that a finder of fact could determine that Dailide's account is not truthful, and that he met the standards established by law for assisting in persecution. However, under the standards developed, it is a very key question whether Dailide was armed when he participated in the arrest of certain fleeing Jews, and when he took part in the search of particular prisoners. Dailide's accounts can be read two ways, and are certainly not undisputed.

There is also a key factual dispute as to the nature of that search and of Dailide's questioning of prisoners. The court's expansive account of that questioning, *supra* at 15-16, may be correct. However, it is not supported by undisputed facts in the record, and thus cannot be taken, at this stage, as a correct statement for purposes of summary judgment. Dailide's account, and the face of the documents in which he is specifically mentioned, are consistent with a history in which he was no more than a glorified desk clerk, filling out forms and recording prisoner responses.

Again, that account may not be true, but it must be taken as such on summary judgment.

The crucial difference between summary judgment and full trial is shown by two cases. In *United States v. Osidach*, 513 F. Supp. 51 (E.D. Pa. 1981), heavily cited by the government