**UNITED STATES of America,**
**Plaintiff,**

v.

**Mykola WASYLYK, Defendant.**

**No. 1:99–CV–1991.**

United States District Court,
N.D. New York.

July 13, 2001.

Joseph A. Pavone, Esq., United States Attorney, James C. Woods, Esq., Assistant United States Attorney, Albany, Eli M. Rosenbaum, Esq., Director, Susan L. Siegal, Esq., Principal Deputy Director, Ellen L. Chubin, Esq. and Jeffrey L. Menkin, Esq., Senior Trial Attorneys, Office of Special Investigations, United States Department of Justice, Washington, D.C., Counsel for Plaintiff.

Brian M. Gildea, Esq., The Hotchkiss House, New Haven, CT, Counsel for Defendant.

## MEMORANDUM–DECISION AND ORDER

MORDUE, District Judge.

## INTRODUCTION

The United States moves for summary judgment, Fed.R.Civ.P. 56, on Count I of its complaint in this action to revoke defendant's United States citizenship on the ground that it is based on an invalid visa.

## BACKGROUND

On November 18, 1999, the United States filed a four-count complaint to revoke defendant's citizenship based on the assertion that it was illegally procured and is therefore revocable under 8 U.S.C. § 1451(a) [1], because it was not procured

---

1. 8 U.S.C. § 1451(a)(emphasis added) provides in part:

It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any district court of the United States in the judicial district in which the naturalized citizen may reside at

while defendant was "lawfully admitted for permanent residence" to the United States, as required by 8 U.S.C. § 1427(a).[2] The United States moves for summary judgment on Count I, which charges that defendant's admission to the United States was not lawful because it was based on a visa for which he was ineligible under the Displaced Persons Act of 1948 ("DPA")[3] due to his service during World War II as a guard at Nazi-operated forced-labor camps at Trawniki and Budzyn, which service constituted assistance to the enemy in the persecution of civil populations.

In order to be naturalized as a United States citizen, one must be lawfully admitted for permanent residence, be of good moral character, be attached to the principles of the Constitution of the United States, and be well disposed towards the good order and happiness of the United States. 8 U.S.C. § 1427(a)[4]; see *United States v. Sokolov*, 814 F.2d 864, 869 (2d Cir.1987). During the years after the Second World War, the DPA, which permitted refugees and displaced persons to emigrate to the United States without regard to previous immigration quotas, provided one avenue of lawful admission for permanent residence. Section 2(b) of the DPA incorporated by reference the definition of "refugees or displaced persons" in the Constitution of the International Refugees Organization ("IRO")[5], which provided

the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization **on the ground that such order and certificate of naturalization were illegally procured** or were procured by concealment of a material fact or by willful misrepresentation[.]

2. All four counts of the complaint charge that defendant's admission to the United States was not lawful because it was based on a visa for which he was ineligible. Count I charges that he was ineligible for the visa because he had assisted the enemy in persecution of civilians, DPA §§ 2(b), 10; Count II charges that he was ineligible because he had been a member of or participated in a movement which was hostile to the United States, DPA § 13; Count III charges that he was ineligible because he willfully misrepresented material facts for the purpose of gaining admission to the United States as an eligible displaced person, DPA § 10; and Count IV charges that he was ineligible under 22 C.F.R. § 53.33.

3. Displaced Persons Act of 1948 ("DPA"), Pub.L. No. 80–774, ch. 647, 62 Stat. 1009.

4. 8 U.S.C. § 1427(a) (emphasis added) provides in part:
No person, except as otherwise provided in this subchapter, shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, **after being lawfully admitted for permanent residence**, within the United States for at least five years and during the five years immediately preceding the date of filing his application has been physically present therein for periods totaling at least half of that time, and who has resided within the State or within the district of the Service in the United States in which the applicant filed the application for at least three months, (2) has resided continuously within the United States from the date of the application up to the time of admission to citizenship, and (3) during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

5. DPA § 2(b) incorporated by reference a portion of the Constitution of the International Refugee Organization ("IRO"), which provided that "war criminals, quislings, and traitors" were ineligible for refugee or displaced person status, as were persons who could be shown "(a) to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or (b) to have voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations." IRO Const., annex I, part II, 62 Stat. at 3051–52. See *Petkiewytsch v. Immigration and Naturalization Serv.*, 945 F.2d 871, 873 (6th Cir. 1991).

that persons who could be shown "to have assisted the enemy in persecuting civil populations" were ineligible for refugee or displaced person status. IRO CONST., Annex I, Part II, 62 Stat. at 3051–52; *see Fedorenko v. United States,* 449 U.S. 490, 495 nn. 3, 4, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981). Entry into the United States pursuant to a DPA visa by a person who was ineligible for refugee or displaced person status did not constitute lawful admission for permanent residence; thus, he or she could not legally procure citizenship under 8 U.S.C. § 1427(a). "It would defeat the paramount purpose of the DPA—to assist those whose lives had been disrupted by persecution—to extend the statute's benefits to the persecutors themselves." *United States v. Schmidt,* 923 F.2d 1253, 1259 (7th Cir.1991).

 The Supreme Court has held that the Government "carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship." *Costello v. United States,* 365 U.S. 265, 269, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). Evidence justifying revocation of citizenship must be " 'clear, unequivocal, and convincing' " and not leave "the issue in doubt." *Schneiderman v. United States,* 320 U.S. 118, 125, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943). "[T]here must[, however,] be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship. Failure to comply with any of these conditions renders the certificate of citizenship 'illegally procured,' and naturalization that is unlawfully procured can be set aside." *Fedorenko,* 449 U.S. at 506, 101 S.Ct. 737. As the Supreme Court observed, "[n]o alien has the slightest right to naturalization unless all statutory requirements are complied with; and every certificate of citizenship must be treated as granted upon condition that the government may challenge it ... and demand its cancella-

tion unless issued in accordance with such requirements." *United States v. Ginsberg,* 243 U.S. 472, 475, 37 S.Ct. 422, 61 L.Ed. 853 (1917).

 It is familiar law that a party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied its burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. *See id.* If the nonmovant fails to carry this burden, summary judgment is appropriate. *See id.* Even in denaturalization cases, the facts of a case may be such that revocation of citizenship at the summary judgment stage is appropriate. *See, e.g., United States v. Dailide,* 227 F.3d 385, 389 (6th Cir.2000).

## THE MOTION

The United States, in moving for summary judgment on Count I, argues that defendant's admitted service as an armed guard at the Trawniki and Budzyn forced-labor camps constitutes assistance in the persecution of civilians as a matter of law and that therefore defendant was ineligible for a visa under the DPA.

### Affidavit of Dr. Peter R. Black

Dr. Peter R. Black, Senior Historian and Director of the Division of the Senior Historian at the Center for Advanced Holocaust Studies at the United States Holocaust Memorial Museum in Washington, D.C., and former Historian at the Office of Special Investigations in the United States Department of Justice, submits a detailed affidavit reviewing the evidence in the file,

including defendant's deposition testimony and the extensive documentary evidence. He concludes:

> The evidence demonstrates that the defendant, Mykola WASYLIK, was born October 4, 1923, in what is today Tyshkivtsi, Ukraine. He came to the Trawniki Training Camp on or about April 7, 1943. There, armed with a rifle, he guarded the Jewish prisoners in the adjacent labor camp while training at Trawniki for approximately two and one-half months. The evidence shows that WASYLYK then transferred to the SS Labor Camp Budzyn on June 24, 1943, where he served in the Trawniki-trained guard detachment from June 24, 1943 until approximately late November 1943. There, too, he was armed and guarded Jewish prisoners. I have reviewed wartime records and postwar statements and testimonies that document Mykola WASYLYK's membership in a unit known as the SS Guard Forces of the SS and Police Leader in the Lublin District, his training at Trawniki Training Camp and his subsequent service in the Trawniki-trained guard detachment assigned to the SS Labor Camp Budzyn. Based on this documentation and upon my knowledge of the duties of the guards trained in and assigned to such units, I conclude that Mykola WASYLYK, the defendant, served as an armed guard of civilian prisoners at a forced labor camp for Jews at Trawniki in the period between April 7, 1943 and June 24, 1943. I conclude further that he served as an armed guard at a forced labor camp for Jews at Budzyn in the period between June 24, 1943 and approximately November 1943. I also conclude that at both camps he assisted in preventing prisoner escapes and in enforcing the conditions of the prisoners' unjust imprisonment.

Extensive and undisputed documentary evidence supports Dr. Black's affidavit.

**Visa application**

Defendant's application for a DPA visa describes his location during the war as "Apr. 43–Apr. 45 at Dresden, Germany." The supporting report of the Displaced Person's Commission, dated April 28, 1949, states that defendant "farmed near Tyszkiwci, Galicia, Poland [from 1940 to 1943]; that in April 1943 he entered Germany and was employed as a laborer by a paper firm in Dresden, Germany; [and] that from 1945 to 1946 he was employed as a policemen in the [displaced persons'] camp police of Augsburg, Germany[.]" The visa was granted on May 18, 1949.

Defendant's deposition testimony

In his June 5, 2000, deposition in this action, defendant testified as follows. He was born in 1923 in the village of Tyshkivtsi (Tyszkowce), which was formerly part of Poland and is now part of Ukraine. In April 1943, a German official came to his village and ordered about 20 young men, including defendant, to work for the Germans. Under guard of German soldiers, they were taken by train to a camp in Trawniki, Poland. They were assigned to barracks, given uniforms and trained to use rifles. Once, in late May, defendant was assigned to patrol the perimeter of the camp to prevent people from entering or leaving. At some point he learned that about 500 or 600 Jews were in the camp.

In July 1943, defendant's unit, still under German control, was sent to Budzyn, Poland. Defendant knew that Budzyn was a labor camp for Jews. He estimated that there were about 1,000 Jews there, both men and women. Neither he nor anyone else killed any prisoners during the three months he was there. He was occasionally assigned to watch from a watchtower. On those occasions he carried a loaded rifle;

he carried extra ammunition in a case. Although defendant's deposition testimony occasionally appears contradictory and evasive, it is clear without question that he admits having assumed guard duty in a watchtower at Budzyn numerous times. The Court attaches as an Appendix the portions of defendant's testimony which pertain to his duties at Budzyn.

In autumn 1943 defendant's unit returned briefly to Trawniki, then was sent to Lublin, Poland, where they remained until June 1944, in training to go to the eastern front. The Germans took them to another camp, probably Poniatowa, for five or six weeks, then they set out for Trawniki. Before they arrived, the Russians bombed Trawniki, so they returned to Lublin. From Lublin, he and two or three hundred men, still under German control, walked to Dresden, where they helped clean up after the bombing. They were in Prague when the war ended. From late 1945 until 1949 defendant lived in a displaced person's camp in Augsburg, Germany. In 1949 he applied for and obtained the DPA visa now in issue.

**Defendant's affidavit**

In response to this motion, defendant submits an affidavit stating:

1. I was born in Tyshkibtsi Ukraine on October 5, 1923.

2. In early 1943, the German Army invaded the area where I lived and ordered the village elders to deliver the names of teen age boys and young men.

3. I was taken as a slave worker or slave laborer to do work for the Germans in April, 1943.

4. I was transported by the German Military to the Trawniki camp in locked rail cars.

5. At Trawniki, I came under the control of Russian Prisoners of War who, in turn, were guarded by Germans.

6. At no time did I voluntarily participate in any activities ordered by the Germans.

7. I deny any claim or insinuation that I was an armed guard who knowingly and willingly persecuted civilians.

8. I never persecuted, killed, injured or subjected anyone to physical force or harassment.

9. I never took an oath or swore allegiance to Germany.

10. I never enlisted in the German Military.

11. I never participated in any persecution of Jews.

12. I was not an armed guard or a member or a soldier in the German Military Service.

13. I was forced to serve as a watchman similar to a watchman in the United States as who keeps a watch over things.

14. Although I know of no witnesses to my whereabouts during World War II, I do know that no one has come forward as an eye witness against me.

15. When I entered the Displaced Persons Camp at the end of the War, I was asked where I had been just prior to the end of the War. I responded Dresden, which is true.

16. When asked what I was doing in Dresden, I stated I was cleaning up the rubble and removing bodies from the area as a laborer under the German Army, which is true.

17. At no time did I lie when asked questions.

18. I did not speak, read or write English during this time.

19. I did not fill out any forms and relied upon volunteers and translators to help me when asked to sign something I could not read.

20. I was never directly questioned by any person of the Displaced Persons Commission. I was never told what was in the application, nor was I asked to verify facts therein.

## DISCUSSION

 Defendant admits in his deposition that he served an indeterminate number of two-hour shifts manning one of the two watchtowers at Budzyn carrying a loaded rifle and extra ammunition. His role was to "watch" or "guard" the main gate. Although in his deposition defendant initially asserted that he had served only one two-hour shift in the watchtower, he later clarified this "misunderstanding" and explained that he had served an indefinite number of two-hour shifts in the watchtower in rotation with other Trawniki-trained men. His affidavit on this motion does not specifically address his watchtower duties. The statement in the memorandum of law sub-

mitted on defendant's behalf that his "forced labor was on one occasion for two hours sitting in one of the two watchtowers at night" mischaracterizes defendant's own testimony; defendant himself effectively retracted and corrected the testimony on which it is based.[6] Similarly, in his deposition, defendant stated that his initial testimony that the rifle he carried was not loaded and he had only one bullet was a "misunderstanding." Rather, he stated, there was one bullet in the rifle and he carried more bullets in a case. Thus, the competent, admissible evidence establishes without contradiction that defendant served an indeterminate number of two-hour shifts at Budzyn forced-labor camp manning one of the two watchtowers overlooking the main gate, carrying a loaded rifle and extra ammunition.

Defendant knew that Jews, including women, lived at the Budzyn camp in barracks and that during the day they left the camp in a guarded group to work in a factory.[7] The main gate was kept closed; he does not know who opened it to allow

---

6. Defendant testified in part as follows (also see Appendix):

 Q. Mr. Wasylyk, I just want to make sure that I am understanding what we have been talking about for the past, you know, half hour or whatever about Budzyn. Are you saying that in the three months that you were stationed at Budzyn that you spent a total of two hours -
 A. No, I didn't say that.
 Q. —during those three months? Okay, so what—what are you saying?
 A. You see, every two hours, I mean not every two house [sic], every change of watchman I was going again and again and -
 Q. And how frequently was that?
 A. I believe that we have about four or six hours, you know, where we stay two hours then another guy goes, another guy goes and then us again, you know, me. Okay. And then again. And that's how—that's how it works.

 Q. And it would work this way everyday while you were stationed at Budzyn?
 A. You see, I am very peculiar person, you know, you said and that works everyday. I can't say that because I didn't stay everyday. I serve, you know, this watchman duty so many times as they need. Okay. But I mentioned to you that I was once on that watchtower. Okay. Once on the watchtower. But that doesn't mean that I was just two hours and I don't go there again. When my turn came I went another time there.

7. The memorandum of law submitted on this motion states that defendant did not know that Jewish people were in the camps until "later on." It is clear from defendant's deposition transcript, however, that the statement on which the memorandum of law relies pertains only to defendant's duties at Trawniki and not to his duties at Budzyn.

the Jews to enter and leave. Defendant also stated that the Jews performed services without pay for the Trawniki men such as dentistry and repairing clothing and shoes, and he recounted a story of a friend who went to one of the Jews for dental work. Nothing in his affidavit contradicts this testimony. Thus, the undisputed evidence is that defendant knew that the Jews living at Budzyn were prisoners, that at least some were civilians, that they were put to work in a factory, and that they were compelled to perform free services for the guards. The conclusory statement in defendant's memorandum of law that while he was at Budzyn he was unaware of any persecution of Jews is not supported by his deposition testimony.

The gate was guarded by two watchtowers; according to defendant, the presence of the watchtowers made it unnecessary to patrol the perimeter of the camp. Even accepting defendant's statement that neither he nor anyone else killed any Jews while he was there, it is obvious that the presence of armed, uniformed guards served to oppress the inmates [8] as well as to deter any attempts to escape, resist or obtain help.[9] Defendant's portrayal of himself as a slave laborer no different from the Jews does not mitigate the fact that as an armed, uniformed guard at a watchtower at the gate of a forced labor camp, he assisted in the Nazis' imprisonment and forced labor of Jewish inmates of the camp.

Defendant's statements in his affidavit on this motion such as: "I deny any claim or insinuation that I was an armed guard who knowingly and willingly persecuted civilians," "I never persecuted, killed, injured or subjected anyone to physical force or harassment," and "I never participated in any persecution of Jews," advance conclusions, not evidentiary facts, and do not raise any questions of fact requiring a trial. His statement: "I was not an armed guard or a member or a soldier in the German Military Service," does not rule out service as an armed guard in a capacity other than in the German Military Service, and, in the absence of evidentiary factual allegations, raises no question of fact.

Courts have uniformly concluded that service as an armed guard at a forced-labor or concentration camp constitutes assistance in the Nazi program of persecution, regardless of whether the defendant himself personally injured or killed any victims. *See, e.g., Fedorenko,* 449 U.S. at 512–14, 101 S.Ct. 737 (armed concentration camp guard); *Schmidt,* 923 F.2d at 1258–59 (armed concentration camp guard); *United States v. Kairys,* 782 F.2d 1374, 1378 (7th Cir.1986) (armed guard at labor

---

**8.** In *United States v. Osidach,* 513 F.Supp. 51, 99 (E.D.Pa.1981), the court found that the defendant's role as an armed, uniformed interpreter for the interrogation of suspects could be classified as both physical and mental persecution, stating that "The mere presence of the watchful eye of the conqueror or his deputies, coupled with the often demonstrated presence of both the means and the inclination to persistently inflict various indignities, physical abuse, injuries or even death, without notice or reason, is the personification of mental persecution...." *Accord United States v. Dailide,* 227 F.3d 385, 392–93 (6th Cir.2000).

**9.** Defendant made the improbable assertion that if prisoners had tried to escape no one would have shot them and that if an escape attempt had occurred while he was on watch he would "probably sleep ." Even assuming the truth of this assertion, the presence of uniformed guards armed with rifles in watchtowers overlooking a locked gate would oppress the inmates and deter them from attempting to escape, regardless of whether the guards secretly did not intend to shoot them.

camp); *United States v. Demjanjuk,* 680 F.2d 32 (6th Cir.1982) (armed guard at forced labor camp and extermination camp). As the Seventh Circuit observed, "in cases **not** involving armed guards . . . a showing of personal involvement in persecutions may be necessary. Nonetheless, . . . **service as an armed guard equals persecution.**" *Kairys,* 782 F.2d at 1378) (emphasis added); *accord United States v. Tittjung,* 235 F.3d 330, 341 n. 8 (7th Cir. 2000) ("The proposition that an armed concentration camp guard 'assisted in persecution' . . . cannot be disputed."); *Schmidt,* 923 F.2d at 1258–59 ("[T]he activities of an armed concentration [camp] guard must be viewed as contributing to the collective effort of the Nazis to persecute innocent civilians"); *Schellong v. Immigration and Naturalization Serv.,* 805 F.2d 655, 661 (7th Cir.1986) (armed guards at concentration camp "cannot deny that they aided the Nazis in their program of racial, political, and religious oppression"); *cf. United States v. Sprogis,* 763 F.2d 115, 120–22 (2d Cir.1985) (local police officer's passive accommodation of Nazi conquerors by performing ministerial acts "do[es] not amount to the kind of active assistance in persecution which the DPA condemns.").

■ It is irrelevant whether defendant performed his duties voluntarily or involuntarily. The *Fedorenko* court stated: "Under traditional principles of statutory construction, the deliberate omission of the word 'voluntary' . . . compels the conclusion that the statute made **all** who assisted in the persecution of civilians ineligible for visas." 449 U.S. at 512, 101 S.Ct. 737 (emphasis in original). Thus, service—voluntary or involuntary—as an armed guard in a concentration camp constitutes assis-

tance in persecution under the DPA as a matter of law. *Id.* at 514, 101 S.Ct. 737; *see Schmidt,* 923 F.2d at 1257–58. Moreover, because this motion is based on the charge that defendant was ineligible for a visa—not on the charge that he made misrepresentations to obtain the visa—it is irrelevant what defendant told the interviewers or whether he understood the visa application form. *See Tittjung,* 235 F.3d at 341; *United States v. Ciurinskas,* 148 F.3d 729 (7th Cir.1998); *United States v. Stelmokas,* 100 F.3d 302, 316 (3d Cir.1996) ("Thus, even if we held that [defendant's] misrepresentations were not material and, indeed, even if he made no representations at all to obtain the visa, his appeal [from judgment of denaturalization] is doomed, as he was not eligible for a DPA visa[.]"); *Sokolov,* 814 F.2d at 873–74.

The undisputed evidence, viewed in the light most favorable to defendant and with all ambiguities resolved in his favor, is clear, unequivocal and convincing. It establishes that defendant served as an armed guard at Budzyn, a Nazi-operated forced-labor camp for Jewish prisoners, at least some of whom were civilians.[10] A thorough review of the record reveals no genuine issue of material fact. While defendant submits conclusory assertions that he "never participated in any persecution of Jews" and did not "knowingly and willingly persecute[ ] civilians," common sense as well as strong legal precedent compel the conclusion that as a matter of law his undisputed service as an armed guard at Budzyn establishes that he "assisted the enemy in persecuting civil populations" within the meaning of the DPA. Such service rendered defendant ineligible for the DPA visa pursuant to which he entered

10. In light of this finding, the Court does not address the questions of the credibility of defendant's testimony regarding the extent of his service as an armed guard at Trawniki or whether the single incident of patrolling the Trawniki perimeter to which defendant admits is sufficient to establish assistance in persecution as a matter of law.

the United States. Therefore, as a matter of law, defendant's citizenship was illegally procured because it was not procured while defendant was "lawfully admitted for permanent residence" to the United States, as required by 8 U.S.C. § 1427(a). Defendant's citizenship is subject to revocation under 8 U.S.C. § 1451(a).

■ Where, as here, the undisputed evidence, viewed in the light most favorable to defendant and with all ambiguities resolved in his favor, clearly, unequivocally and convincingly establishes that defendant's citizenship was illegally procured, the United States is entitled to summary judgment granting a judgment of denaturalization. *See, e.g., Dailide,* 227 F.3d at 389 (summary judgment where undisputed facts showed that defendant had assisted in detaining two Jews who had escaped from ghetto); *United States v. Koreh,* 59 F.3d 431, 440 (3d Cir.1995) (summary judgment where undisputed facts showed that defendant had served as editor of pro-Nazi newspapers in Hungary); *Schmidt,* 923 F.2d at 1259–60 (summary judgment where undisputed facts showed that defendant had served as armed guard at Nazi concentration camp).

■ At first blush, it may seem that, after the passage of so many years, no purpose would be served by revoking defendant's citizenship, particularly in view of his advanced age and apparently blameless life in the United States, as well as his assertion that he was forced to serve the Nazi regime and did not do so by choice. It cannot be disputed that the consequences of loss of citizenship may be severe. *See generally Kairys,* 782 F.2d at 1381, *and cases cited therein.* Legal precedent establishes beyond question, however, that, in the face of the established facts of defendant's service as an armed guard, there is no basis to deny the United States a judgment of denaturalization.

*See Fedorenko,* 449 U.S. at 517–18, 101 S.Ct. 737. The precious right of American citizenship can rightfully be obtained only by strict compliance with all congressionally imposed prerequisites to its acquisition. *See id.* at 505, 101 S.Ct. 737. Here, where the United States has demonstrated by clear and convincing evidence that defendant was not eligible for the visa upon which his naturalization was based, denaturalization does no more than "deprive[ ] [defendant] of a privilege that was never rightfully his ." *Johannessen v. United States,* 225 U.S. 227, 242–43, 32 S.Ct. 613, 56 L.Ed. 1066 (1912). While this result may appear harsh, the Court notes that for approximately fifty years defendant has enjoyed the benefits and privileges of a United States citizenship to which he was not legally entitled. "Courts are without authority to sanction changes or modifications [in the prerequisites to citizenship]; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare." *Ginsberg,* 243 U.S. at 474, 37 S.Ct. 422 (1917). Thus, this Court has no equitable discretion to deny the United States a judgment of denaturalization to which it has demonstrated its entitlement. *See Fedorenko,* 449 U.S. at 517–18, 101 S.Ct. 737.

## CONCLUSION

The Court holds that as a matter of law, defendant was not "lawfully admitted" into the United States for purposes of naturalization under 8 U.S.C. § 1427(a), and that his citizenship and certificate of naturalization were "illegally procured" within the meaning of 8 U.S.C. § 1451(a). The plaintiff is entitled to summary judgment on Count I of the complaint.

It is therefore

ORDERED that the motion by the United States for summary judgment on Count I of the complaint is granted.

IT IS SO ORDERED.

**Excerpts from deposition of defendant Mykola Wasylyk, June 5, 2000**

**Pages 145—192**

BY MS. CHUBIN:

Q. Okay. What were the other places that you worked?

A. The other one in about end of June or July they took us to place that called Budzyn. Okay. We were living in the building and there was concentration camp. Okay. What else you want to know.

\* \* \* \* \* \*

Q. Now, there was a labor camp for Jews at Budzyn; right?

A. Correct, correct.

Q. Was there a fence around the labor camp?

A. Yes.

\* \* \* \* \* \*

Q. So it was a wire fence?

A. Yeah, wire fence, yes, you can see that and it was gate, gate. And I saw a few times people was there making, you know, because it was hot they was laying on the grass enjoying themselves.

Q. Enjoying themselves?

A. Well, I mean to the sun, you know. I am not saying that everybody was enjoying, but that was no—nothing that we would see tragic, you know, to those people. They was behind the fence, yes. But I never saw anybody, you know, punish them or something, you know. They was inside. That's it.

Q. About how many prisoners were there?

A. It was bigger camp that in Trawniki, I would say good thousand or better people. But I am saying again I am not counting anybody and I don't know how many, but approximately.

Q. Okay. And were they all Jews?

A. I don't know. I didn't ask them.

Q. But you know that some of them at least were Jews if not of all them?

A. I would say, yes.

Q. Okay.

A. It was so many, you know, people that I saw only once they was walking to work, these people from the camp.

Q. Were they guarded while they were walking to work?

A. Yes.

Q. Were you guarding them?

A. No. That Polish uniform kapos. Jewish people was walking with them and they was singing beautiful song and they was walking to—to factory. I don't know where the factory was. But there was factory there probably a few -few kilometers. We never lead them or walk them.

Q. There were no Ukrainians accompanying them?

A. Beg your pardon?

Q. Weren't there any Ukrainians accompanying them? You said there were Polish–Jewish kapos?

A. Never, ever was walking those people other than themselves. They was trustfully to all those people that was—there was few Germans, you know, in charge.

Q. Germans—

A. German in charge of us.

Q. —accompanying them?

A. Okay. German was in charge of us.

Q. Who were the Germans in charge of you? Do you remember any of their names?

A. No, no names, but I know very low rank Schutz—Schutz policeman they called them.

\* \* \* \* \* \*

Q. Okay. But the Germans who were there—the Germans who were there they were part of you are saying the schutzpolizei?

A. Yeah, they was—they was German but they wasn't SS, you know, you have—you have to separate. We were watchmens, no insignia, no any German army. Okay. And they have German people in police, is Schutz police. They—they was calling every—everyone of us schutzpolizei. And that rank was like sergeant, I mean ranking, you know. I'm sure, you know, all these ranks from this to that. And that's all. And I don't remember if any—any SS, even low—low rank—once a guy came from front, front, from Russian front, he was SS but—probably over all camp, you know, whatever.

\* \* \* \* \* \*

Q. But at—at the site, but actually at the site, actually at the camp who ran the show amongst the Germans?

A. You—you—you mean—

Q. At—

A. —concentration camp?

Q. —at Budzyn?

A. Concentration camp?

Q. The labor camp, yes.

A. Concentration camp?

Q. Yes, yes.

A. I didn't see one person that would be this guy that was our company head, he was in charge of everything.

Q. And who was that?

A. This schutzpolizei, this police meister. I don't know his name.

\* \* \* \* \* \*

Q. Now, getting back to the prisoners that were there, were there women -

A. Yes

Q. —amongst the prisoners?

A. Yes.

Q. Were there children?

A. I didn't see children, no.

Q. But you did see women?

A. Men and women, young people 20, 18, maybe, you know, but at that time I saw them marching and singing they was real, you know, something to see. And, you know, people from their camp was on the side, both sides of the thing and they was walking, walking nicely, you know, no—nobody was beating them or anything, it was very nice.

Q. Did they have yellow stars on their clothing?

A. This head is too old. I don't remember seeing it. Maybe, maybe they was but.

Q. Okay.

A. I—I can't honestly say yes, I saw it.

Q. But you knew they were Jews even if they didn't have yellow stars?

A. Yes. I know, yes.

\* \* \* \* \* \*

A. . . . Sure, that it would be ridiculous to say, you know, they was in prison, yes. We were in prison, too. We can go nowhere, we can do nothing we want and our life was ruined, et cetera, and those people even worse was ruined, probably, you know. But, you know, outside I didn't see it.

Q. Did you ever see any of the Jews being beaten?

A. No, not once.

Q. Did you ever see any dead bodies?

A. No.

Q. Never?

A. Swear to God.

\* \* \* \* \* \*

A. I was—I was again because so many people that you have once, sometime twice you have these watching hours. I never saw Jews or other people that I would see someplace that they was working thing. I saw only once that they was marching from factory home.

Q. Where was the factory?

A. I—I never been in that factory. I don't know what they was making. Somebody told me that they were preparing the uniform for soldiers, German soldiers, you know. But I don't know, I wasn't there. I never saw it.

Q. Where were you when you saw them marching?

A. I was right in the front of my building where we were staying. I was on the sidewalk talking, you know, two of us was talking, you know, nonsense talking. That's it. And then they start walking and they was singing and they was really beautiful singers, you know. And there was guy who was leading them and they pass us, turn to the camp, went in.

Q. Were there watchtowers at Budzyn?

A. You mean those—the -

Q. Guard towers?

A. Yes. Two, two.

Q. Two?

Q. Two, yes.

Q. Where were those two towers located?

A. On one side and then the other side for front wall, front fence.

\* \* \* \* \* \*

Q. Were you ever in those guard towers?

A. Yes, I was once.

\* \* \* \* \* \*

Q. . . . Now you said there was one time when you guarded—

A. Yeah.

Q.—the [Budzyn] labor camp?

A. I was once.

Q. Okay. Tell us about that one time?

A. I was just two hours sitting—sitting in that tower and watching. It was night-time, nobody was outside and that's it.

Q. Did you have a gun?

A. Yes.

Q. What kind of a gun?

A. Yes.

Q. A rifle?

A. Yes, Russian rifle.

Q. And it was loaded?

A. No. We didn't load them. We load only if something would arrive. But no-body—everything was quiet there—no-body—nobody walk, nobody runs, nobody nothing.

Q. Okay. So you had ammunition with you?

A. We have ammunition in the building that all guys was waiting for that day to serve as a watchman.

Q. Okay. So—so you went to that building, got ammunition and then went—

A. They—

Q. —up to the guard tower?

A. They—they usually give you one bullet, one bullet, usually.

Q. Really. I find it hard to believe that they would put guards in a tower with a single bullet.

A. Yes. Because they have—they have other guns near—or near the gate.

Q. Oh?

A. Okay.

Q. And what other guns were there?

A. And I'm saying that I was there and they was not—even when we go anywhere they don't want to give us more than five bullets. Okay. That's single, single bullet goés into the rifle, Russian rifle, you don't need really much thing because you have to load it one by one.

Q. Uh-huh.

A. And so it wasn't—it wasn't prepare something to—with machine gun or something to kill that somebody would escape, if somebody would escape there they would be healthy today because nobody would shot them there—

Q. What—

A. —because we hate those people that took us there. Do you understand?

Q. Actually I don't understand. You were in a guard tower, what was your function in that guard tower?

A. Just to watch and nothing was to watch because nobody was there.

Q. Okay. And what if somebody would try to escape what would you do? What were your instructions?

A. I would probably—I would probably sleep. Do you understand, because we—

Q. What were your instructions?

A. Our instruction was that go there and watch.

Q. And that was it?

A. That's it.

Q. Just watch? And if all the prisoners decide to escape just watch?

A. You know what, you wouldn't believe it.

Q. These were your instructions?

A. Yes, no, no, not—

Q. To do nothing—

A. No, no.

Q. —to sit there and watch as all the prisoners escape?

A. Yeah, that's right. Because you were alone in it—you are alone.

Q. Mr. Wasylyk, you must think I'm very stupid. The Germans instructed you to sit there and do nothing as the prisoners tried to escape? I find that very difficult to believe.

A. Okay, I tell you something. No German was giving us any instruction there to go. They have one guy that says okay, this name, that name, this name, that name and you go today from that hour to that hour to stay in watchtower.

Q. And what were you supposed to do in that watchtower?

A. Usually I am telling you what I did, sit, watching outside what's going on.

Q. Okay. And what was going on?

A. Nothing. People was sleeping, people was inside the barrack because it was nighttime. I wasn't there in daytime never.

Q. Did you hear of other guards having an opportunity or a situation where they needed to use their weapons?

A. Nobody use it.

Q. No—no guard never used his weapon?

A. No, never.

\* \* \* \* \* \*

Q. We were just talking about the treatment of the Jewish prisoners at Budzyn?

A. Uh-huh.

Q. Now, you said there was one evening when you guarded in the guard tower?

A. Uh-huh.

Q. Approximately when was that, what month?

A. Let me see, let me see. Probably it was July or August.

Q. And what did you do the rest of the time that you were there at Budzyn?

A. We have other things to do.

Q. Tell me.

A. The only—

Q. What—what were you doing?

A. Tell you what. We go with—with group of people, you know, by how they call it zug, you know with the platoon.

Q. Okay.

A. We got to the woods and we make fighting game. One guys goes with his group that way, the other goes that—that way and then they plan to see how those people where they act when this group will catch them in, you know, bad position.

Q. Uh-huh.

A. And then, you know, in the training, that's it.

* * * * * *

Q. So I'm trying to get an idea of what your daily life was like at Budzyn. I mean I assume you woke up at a certain time?

A. Yes.

Q. And then what would you do all day?

A. We go outside and we have practicing like here people go to reducing fat to the places and we go outside.

Q. You mean calisthenics?

A. No, no, no, no, no.

Q. What are you talking about reducing fat?

A. We go outside and we train—to turn this way, turn that that way and on the command, running, you know, let's march

fast, slow, go on the ground, you know, crawl on—on the thing, you know that's what kind of thing they do. And then we have lunch, you know, and people sit an hour or whatever, you know, and they eat their—their food. And they go again either to the woods to make this kind of play like I said before and that's it.

Q. So while you were doing this—

A. Yeah.

Q. —who was guarding the Jewish labor camp?

A. We have extra people. I told you from beginning that we have ten or 12 people that they are staying near the camp in an extra building where they have building for shoe repairs, or for clothing repair to, you know, you know, there was Jewish people doing that outside, outside the fence. And there was a place that people were standing there and they was watching whatever their time comes to what hour they have to stay, two hours watching that.

Q. And who were those people who were guarding the Jews as they repaired clothing?

A. Nobody.

Q. You just said there were people—

A. You don't believe—hum?

Q. You just said that there were people who—

A. You see—

Q. —were watching as the Jews were working—

A. —what you—

Q. —in this other building?

A. —what you try to do—what you was try to do you try to confuse me. I said and I will not make it because-

Q. Well, let's have the Court Reporter read it back. . . .

A. Jewish people professional that makes—makes repair shoes, make jackets to fix—

Q. Right, right.

A. —everything. They was outside the barracks—

Q. Uh-huh.

A. —and they was outside, nobody watched them. They was doing -

Q. Nobody was guarding them?

A. No. They was dentists, they was doctors. They was outside, I mean not outside, it was in the building—

Q. Uh-huh.

A. —and over here was those people that supposed to have duty that day.

Q. And—okay. The people who were supposed to have duty that day, those were Trawniki men, right—

A. Whatever—

Q. —men from Trawniki?

A. —you call Trawniki, Budzyn men—

Q. Right, right.

A. —make no difference.

Q. Right. But men who were trained at Trawniki and arrived there in your group?

A. Yeah, yeah, correct, yes.

Q. Okay. Now, each day didn't you take turns?

A. Yes.

Q. Okay.

A. Yes, you have—you have a hundred, a hundred twenty people, you could count eight guys or six guys or even ten I don't know because I never count them, I never been—in charge of any this kind of thing. But I know that they said okay, Wasylyk, this, this, this guy, today is your duty.

Q. Uh-huh.

A. And you go there in the morning 8 o'clock and you stay until next morning.

Q. Okay.

A. And that the thing. Eight or ten men in that—in that little booth near the gate. Okay.

Q. Okay. So you guarded the gate from 8 A.M. to 8 P.M.?

A. I said we have a premises that all those guys were sitting inside waiting for their turn to go to—to watching, watch on the tower or whatever. That's what I am saying.

Q. Okay. So—so at some point you are saying each person would guard the gate of the labor camp?

A. I didn't say that.

MR. GILDEA: He said watch.

BY MS. CHUBIN:

Q. Okay, watch, call it watch then, that's fine.

A. Well, you see, you know, I tell you the truth -

Q. I just—Mr. Wasylyk, I'm just trying to understand. You just mentioned that there was a gate—

A. Yes.

Q. —and that people would take turns guarding the gate?

A. I said there was a gate, next to the gate was little premises.

Q. What's a premises?

A. The little building, little barracks.

Q. Uh-huh.

A. Okay.

Q. Uh-huh.

A. Now you understand what I am talking about? Near the gate-

Q. Uh-huh.

A. —was the—was the little barracks that was used by watchmen of my group -

Q. Okay.

A. —that I was there.

Q. Okay.

A. Okay. Next to this little barracks was professional barracks, the way I recall, professional barracks. There was Jewish people working there, shoe repair, uniform repair, whatever thing including dentists because I know that—that friend of mine went there to him and the guy took his old teeth out and before—before anything happened he left Budzyn and he never fix his teeth. He is not alive today. That Bandurka that I—I told you, you know. And there was a doctor on the premises, also Jewish people from the camp and nobody watched them. Okay.

Q. So why didn't they leave?

A. Why, who?

Q. The Jewish people. If they were not being watched—

A. Okay.

Q. —then why didn't they just leave?

A. Let me ask you a silly question. I believe that in Budzyn was close to four-teen maybe fifteen hundred people, not more, but let's say. Why didn't they es-cape. One guy here, one guy there, and they have little trees on the back of the thing over here but they can't escape. Maybe the few would be killed, yes, but all the rest would be escape.

Q. So you are saying they didn't escape because they were being watched by the people who were in these towers?

A. I told you honestly.

Q. I'm just trying to make sure I under-stand you.

A. I understand my—

Q. It's a yes or no question. Were they being watched by a people in the towers, the Jews, they were being prevented from escaping?

A. I can—I can use vulgar words, you know. All those guys didn't give a damn if they—they was this or that. They would—they would escape, they would let them go.

Q. But—but for some reason they did not escape and apparently—

A. Well—

Q. —it's because there were men with guns—

A. That's -

Q. —in towers watching them; right?

A. Well, I—I don't know what to tell you and how to tell you. I told you as close as possible the way me, 19 years old man was brain working.

Q. I am not—I am not actually asking what—how your brain was working. I want to know when, where did you guard and when. That's what I want to know. When were you in the guard tower` and when were you guarding in other places?

A. I was two hours to the guard tower, period.

Q. Okay. If there were a hundred Traw-niki men -

A. Yeah.

Q. —at Budzyn—

A. Uh-huh.

Q. —and you were there for four months—

A. You said it.

Q. —it's impossible that you were only guarding for two hours out of those four months. Obviously you are not telling me everything.

A. No, no, no.

Q. So let's start again.

A. You see -

Q. When were you guarding?

A. Now, wait a minute -

MR. GILDEA: Wait a minute, I am going to object to this. . . .

\* \* \* \* \* \*

MS. CHUBIN: What I'm saying it's impossible that you only guarded for only two hours.

THE WITNESS: Because you don't understand, I didn't say that. I didn't say that.

BY MS. CHUBIN:

Q. It was two hours on, two hours off?

A. I didn't say that. I said that we have 12 hours duty and I am going two hours here and after four hours or so the other people staying there and then again is my turn to go there. Do you understand now?

Q. Now I understand.

A. Hum? You see -

Q. Okay.

A. And you are switching this -

Q. So what hour did that—did that start?

A. You want me to tell you exactly from three to four?

Q. Yes. What was—what was an example of a schedule you would follow?

A. I have no idea what time I was standing there.

Q. Uh-huh.

A. And I don't—I have idea when I finish it. I know when my two hours came up the guy is coming to change me and I am going back to the barracks sleep.

Q. Okay. So you said it was two hours on, then four off and then two hours back on?

A. It depends how many people you have.

Q. Okay, tell me. I wasn't there, you tell me.

A. Yeah.

Q. Yeah.

A. If you have—if you have 12 hours, okay, and you have let's say 12 men. How many people you have to—you have a two—two house, one guy here, one guy there, ten guys are sleeping or if daytime they are talking, okay.

Q. Uh-huh.

A. Two hours pass it, other two guys go, change them, those two guys coming back to the—

Q. How—how many guys in a tower at a time?

A. One.

Q. There was person per tower?

A. One, yes, yes. Because it was no danger—

Q. Now—

A. —there.

Q. Now, you mentioned that back at Trawniki you had patrolled the perimeter—

A. Correct.

Q. —of the camp?

A. The same way.

Q. Were there people at Budzyn doing that? Yes.

A. Exactly, but in Budzyn nobody was walking around the camp, no.

Q. They were not?

A. No.

Q. Okay. Were there people—

A. They was just in the—

Q. —standing along the perimeter of the camp?

A. —tower was standing, the watchman. And in Trawniki there was no watchtowers. They was walking around two hours walk, the other guy coming out, meet him in the—in the certain space, report I given to you, you know, duty, and I am taking it.

He remains, you go back to the barracks. And that—that is not simple.

Q. Now—well, it may be. At Budzyn you are saying there were two guards towers?

A. I said yes but—and there was—there was man stationed in each one at all times, right?

A. Yeah, all the time when they—

Q. Okay. Were there any other spaces where the—where the watchmen were stationed—

A. I never remember that.

Q. —besides the guard towers? At the main gate?

A. Main gate was this little barracks. That was all amount of those people, six, eight or whatever that was standing—was sitting there.

Q. At all times there were six or eight people?

A. At all times they were sitting, yes.

Q. So sometimes you sat there?

A. Yes.

Q. Okay.

A. Yes.

Q. Okay.

A. I was sitting inside the building.

Q. And when you sat inside the building, you had a rifle with you?

A. No. When I was sitting in the building I have no rifles, sorry.

Q. Okay. So what were you doing when you sat in the building?

A. Talking like I am talking to you, talking about girls, talking about this, talking about that.

Q. Were you watching to see who was going in and out of the main gate?

A. What was that?

Q. You said that this little building was next to the main gate. Were you watching to see who was going in or going out of the main gate?

A. The gate—main gate was closed. Nobody was walking in or out like you are saying. Those watchmens on one side and the other side, there was enough because in the camp was almost nobody. There was few people maybe sitting there, maybe they was sick, maybe they was something, but we are not familiar with that. Because we never asked because we have no right to ask anybody about their health or family.

Q. Okay. Who was in charge of opening the gate when the Jewish workers would leave and when the Jewish workers would come back?

A. That—that I don't know.

Q. I assume it was the people in that little building?

A. Might be. But I have—I have no idea who was opposing that gate.

Q. You never opened and closed the gate?

A. I never opened or closed, no.

Q. Uh-huh.

A. Absolutely.

Q. Okay. Well, now, when you were in this little building you must have seen the Jewish workers leaving for work and coming back if you were right next to the main gate; right?

A. I told you and I will repeat once more and I will not say it again. I saw only once, once in my life, once in the Budzyn walking group of people coming from the work home. That's the only I saw it. But I was not close to the gate to see who opened for them and what they do. But I know they was walking, they passed through the road, they passed through this building that we were living in. That's it.

Q. Okay. This—this little building that you said six or eight people would be in, I

thought you said it was next to the main gate?

A. Uh-huh.

Q. Okay. Was there another gate besides the main gate?

A. No.

Q. So every time a Jew left the camp they had to go through the main gate?

A. That gate, yes.

Q. So how is it that you never saw Jews going through the main gate if you say they were leaving each day to go to work and coming back?

A. Simple. I was there only once near that, in that little building near the gate. And that's why I was in that watch tower, okay. I was inside. I wasn't interested who is coming in or out. But I was near my building where we were living and this group of people that happens to be Jews was passing by singing and going in. I wasn't going with them to see it, but I know that they came back from the factory to the—to the barracks.

Q. So you personally, you were only in that little building with six or eight people next to the main gate once?

A. Yes.

Q. Your entire three or four months at Budzyn?

A. Three months not four.

Q. Your entire three months you were only there once?

A. Correct. You figure out 24 hours if you have and if you have a hundred twenty or some men watching, how many men you needed. If you started from this guy, you go to certain days and then start from beginning again and that one that was in the middle of something, he never stayed twice.

Q. If there were six or eight people there at a time and you were only there for a couple hours and you only had a hundred men, I mean I am not a math genius but it sounds to me like you would have to be there more than once in three months. So, you know, unless there was some rotation system where some people were on all the time and other people were off but you don't seem to be saying that.

A. Well, I—I tell you I said it the way I remember. I don't remember how many, I never figure it out with my pencil and paper to figure out how many men I need to—to calculate whole months.

Q. I mean it sounds like every ten days or so you would have had to have been in that little building if there were eight men that were in that building each time.

A. Well, if we have two—two watchtowers you need only four men. Well more than four because every two hours you have to change. You have to have about ten men, yes.

Q. And each person would spend two hours in the watchtower?

A. Yeah.

Q. Okay. And how many hours would you spend in that—that little building with the six or eight people next to the main gate. Was that a two-hour stint?

A. You—you have—you are watching two hours, next group goes for two hours or and then next one goes for two hours and then it comes back to you, you are going second time. Okay. And then again until 12 hour passes. Next day another group of people comes. Okay. They have another 12 hours from such hour to such hour.

Q. And that next day you would be maybe in that little building or you would be where?

A. No, no, no. If you have—if you are watching, you have with group of people four, eight, ten or whatever, you stay all 12 hours there.

Q. Uh-huh.

A. Okay. You have your duty, you go in the watchtower. And if you have no duty you stay inside that watch house. That's all.

\* \* \* \* \* \*

Q. Mr. Wasylyk, I just want to make sure that I am understanding what we have been talking about for the past, you know, half hour or whatever about Budzyn. Are you saying that in the three months that you were stationed at Budzyn that you spent a total of two hours -

A. No, I didn't say that.

Q. —during those three months? Okay, so what—what are you saying?

A. You see, every two hours, I mean not every two house, every change of watchman I was going again and again and -

Q. And how frequently was that?

A. I believe that we have about four or six hours, you know, where we stay two hours then another guy goes, another guy goes and then us again, you know, me. Okay. And then again. And that's how— that's how it works.

Q. And it would work this way everyday while you were stationed at Budzyn?

A. You see, I am very peculiar person, you know, you said and that works everyday. I can't say that because I didn't stay everyday. I serve, you know, this watchman duty so many times as they need. Okay. But I mentioned to you that I was once on that watchtower. Okay. Once on the watchtower. But that doesn't mean that I was just two hours and I don't go there again. When my turn came I went another time there.

Q. Okay.

A. You know—

Q. So—

A. —but I said, listen carefully. I am saying that in the one schedule of boys to make watching, okay, I was there once. And if I stay two times, three times or four times, that's completely irrelevant— not irrelevant, but, you know, I—I can't guarantee how long, you know. But I don't think that I was—let's say on May 5th and then next—next time I went on May 15th, I didn't say that. Because I am sure that I wasn't there on May 15th, two weeks later. Okay. But if I have May 5th and then June 15th or something, I would say maybe because somebody might be sick, they might change the schedule, something, I might, you know. But I—I can't remember today, this was 1943, that's 57 years old. Even the brainy person wouldn't remember, you know. And that's what I am saying. And I try to—to tell you honestly truth about everything.

\* \* \* \* \* \*

Q. There was also—I wanted to make sure I understood what you said about the bullets. I thought you said earlier—about the bullets for your gun, the ammunition, I thought you said earlier at one point that you were only permitted to have one bullet when you went into the guard tower? Did I misunderstand you?

A. You—you probably misunderstanding. I said one bullet was loaded into the gun chamber and another four you have in your pocket—not pocket they have bullet—

Q. Holster?

A. Holster, something like that. You see that's what I mean. And, you know, but they—they because nothing happened nowhere, you know, people—people didn't— didn't need it. But I am not saying that this is right or wrong, that was that they want. But if you come back to this little house, you put your rifle and bullet right to the guy in charge and you didn't have nothing. Okay. That's all.

Q. Okay. And you mentioned some of the jobs that the Jews at the camp did and you mentioned repairing clothing and shoes?

\* \* \* \* \* \*

A. I am talking about these people from the prison camp that was professional in fixing the—fixing or making new boots, jackets, teeth, or health, doctors. They was in that building and if we need anything guys there, we go to them. They don't charge us and they fix it. That's what I was saying. I am not saying that certain Jews didn't work here, there or there because I wasn't there to know where they working. I mentioned to you that in this factory that was marching there back when I saw it on my own eyes, that was probably uniform for German soldier. But I wasn't there and I don't know. That's it.